# UNITED STATES DISTRICT COURT
## For the DISTRICT OF MARYLAND
### Northern Division

**LORETTA BOYD**
11802 Garden Terrace Drive
Dallas, Texas 75243

and

**CHRISTOPHER SAWNEY**
7008 Glenview Drive
Tampa, Florida 33619

      Individually And On Behalf Of All
      Other Similarly Situated Plaintiffs


    vs.

**COVENTRY HEALTH CARE, INC.**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**DALE B. WOLF**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**DANIEL N. MENDELSON**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**RODMAN W. MOORHEAD, III**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**TIMOTHY T. WEGLICKI**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**L. DALE CRANDALL**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**ELIZABETH E. TALLETT**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**ALLEN F. WISE**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

Civil Action: _____

**JOEL ACKERMAN**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**LAWRENCE N. KUGELMAN**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**SHAWN M. GUERTIN**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**PATRISHA DAVIS**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**401(K) PLAN INVESTMENT COMMITTEE**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**JOHN J. RUHLMANN**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

and

**JOHN DOES 1-20**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

       Defendants

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiffs, participants in the Coventry Health Care, Inc. Retirement Savings Plan (the "Plan"), covering substantially all employees of Coventry Health Care, Inc., and its subsidiaries (collectively "Coventry" or the "Company"), individually and on behalf of all others similarly situated (the "Participants"), allege as follows:

## INTRODUCTION

1.     Plaintiffs bring a this action on behalf of the Plan and all Participants and beneficiaries in the Plan to recover losses to the Plan for which the fiduciaries of the Plan are liable pursuant to Sections 409 and 502(a)(2) of the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, equitable tracing, and other monetary relief.

2.    From February 9, 2007 through the present (the "Class Period"), the Plan acquired and held shares of Coventry common stock ("Coventry Stock" or "Company Stock"), which was offered as one of the retirement saving options in the Participant Contribution Component of the Plan.

3.    Defendants, each having certain responsibilities regarding the management and investment of Plan's assets, breached their fiduciary duties to the Plan and Participants by failing to prudently and loyally manage the Plan's investment in Company Stock by, among other things, (i) continuing to offer Company Stock as a retirement saving option; (ii)  continuing to acquire and hold shares of Company Stock in the Plan when it was imprudent to do so; (iii) failing to provide complete and accurate information to Participants regarding the Company's financial condition and the prudence of investing in Company Stock; and (iv) maintaining the Plan's pre-existing investment in Company Stock when it was no longer a prudent investment for the Plan.

4.    As a result of Defendants' fiduciary breaches, as alleged herein, the Plan has suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants.   Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

5.     Because Plaintiffs' claims apply to the Participants as a whole, and because ERISA authorizes Participants such as Plaintiffs to sue for plan-wide relief for breach of fiduciary duty, Plaintiffs bring this as a class action on behalf of all Participants of the Plan during the Class Period. Plaintiffs also bring this action as a participant seeking plan-wide relief for breach of fiduciary duty on behalf of the Plan.

6.     In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are by necessity upon information and belief. At such time as Plaintiffs have had the opportunity to conduct additional discovery, Plaintiffs will, to the extent necessary and appropriate, amend the Complaint or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

<u>**JURISDICTION AND VENUE**</u>

7.     ***Subject Matter Jurisdiction.*** This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

8.     ***Personal Jurisdiction.*** ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in this District.

9.    *Venue*.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

## PARTIES

### Plaintiffs

10.    *Plaintiff Loretta Boyd* ("Boyd") is a resident of Dallas County, Texas.  Plaintiff Boyd is a former Coventry employee and is a participant in the Plan.

11.    *Plaintiff Christopher Sawney* ("Sawney") is a resident of Hillsborough County, Florida.  Plaintiff Sawney is a former Coventry employee and is a participant in the Plan.

### Defendants

A.    **The Company**

12.    *Defendant Coventry* is a national managed health care company that operates health plans, insurance companies, network rental/managed care services companies, and workers' compensation services companies.  The Company maintains its principal place of business at 6705 Rockledge Drive, Suite 900 in Bethesda, Maryland.

13.    Throughout the Class Period, Coventry's responsibilities included, along with its officers, directors and executives, broad oversight of and ultimate decision-making authority respecting the management and administration of the Plan and the Plan's assets, as well as the appointment, removal, and, thus, monitoring of other fiduciaries of the Plan that it appointed, or to whom it assigned fiduciary responsibility.  Throughout the Class Period, the Company exercised discretionary authority with respect to management and administration of the Plan or management and disposition of the Plan's assets.

B.    **Director Defendants**

14.    *Defendant Dale B. Wolf* ("Wolf") was, at all relevant times, the Company's Chief Executive Officer ("CEO") and Director.  During the Class Period, Defendant Wolf was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

15.    *Defendant Daniel N. Mendelson* ("Mendelson") was, at all relevant times, a Director of the Company.  During the Class Period, Defendant Mendelson was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

16.    *Defendant Rodman W. Moorhead, III* ("Moorhead") was, at all relevant times, a Director of the Company.  During the Class Period, Defendant Moorhead was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

17.    *Defendant Timothy T. Weglicki* ("Weglicki") was, at all relevant times, a

Director of the Company. During the Class Period, Defendant Weglicki was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

18.    **Defendant L. Dale Crandall** ("Crandall") was, at all relevant times, a Director of the Company. During the Class Period, Defendant Crandall was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

19.    **Defendant Elizabeth E. Tallett** ("Tallett") was, at all relevant times, a Director of the Company. During the Class Period, Defendant Tallett was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

20.    **Defendant Allen F. Wise** ("Wise") became the Company's CEO in January 2009. Defendant Wise was also a Director of the Company. During the Class Period, Defendant Wise was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility

in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

21.    **_Defendant Joel Ackerman_** ("Ackerman") was, at all relevant times, a Director of the Company. During the Class Period, defendant Ackerman was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

22.    **_Defendant Lawrence N. Kugelman_** ("Kugelman") was, at all relevant times, a Director of the Company. During the Class Period, defendant Kugelman was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

23.    Defendants Wolf, Mendelson, Moorhead, Weglicki, Crandall, Tallett, Wise, Ackerman, and Kugelman are herein referred to as the "Director Defendants."

24.    The Director Defendants appoint the 401(k) Plan Investment Committee.

**C.    Officer Defendant**

25.    **_Defendant Shawn M. Guertin_** ("Guertin") was, at all relevant times, a Plan Administrator. Defendant Guertin also serves as the Company's Executive Vice President, Chief Financial Officer ("CFO") and Treasurer. During the Class Period, Defendant Guertin was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or

discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

26. **_Defendant Patrisha Davis_** ("Davis") was, at all relevant times, a Plan Administrator. During the Class Period, Defendant Davis was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

27. **_Defendant John J. Ruhlmann_** ("Ruhlmann") was, at all relevant times, the Company's Senior Vice President and Corporate Controller.

28. **_Defendant 401(k) Plan Investment Committee_** (the "Committee"). The Committee is the investment fiduciary of the Plan and is responsible for the appointment, monitoring and removal of investment managers and trustees for the Plan, and the establishment of guidelines for the investment funds offered under the Plan.

29. **_Defendants John Does 1-20 ("John Does 1-20")_** are residents of the United States and are or were fiduciaries of the Plan during the Class Period. These defendants whose identities are currently unknown to Plaintiffs, may include additional Coventry employees. Once their identities are ascertained, Plaintiffs will seek leave to join them under their true names.

## CLASS ACTION ALLEGATIONS

30.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who were Participants in or beneficiaries of the Plan at any time between November 1, 2007 and the present, inclusive (the "Class Period) and whose accounts held Company Stock or units in the Coventry Stock Fund, but excluding all named defendants and their heirs or successors in interest.

31.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

(b)     whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's Participants and beneficiaries; and

(c)     whether Defendants violated ERISA.

33.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the other members of the Class each sustained a diminution of vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

34.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, ERISA, and complex

civil and commercial litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

35.    Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class parties to the actions, or substantially impair or impede their ability to protect their interests.

36.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

37.    In the alternative, Plaintiffs request that the Court allow them to proceed under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2). Section 502(a)(2), 29 U.S.C. § 1132(a)(2) states that "[a] civil action may be brought -- " "by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title[.]" ERISA Section 409(a), 29 U.S.C. § 1109(a), sets forth that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable *to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary*, and shall be subject to such other equitable or remedial

relief as the court may deem appropriate, including removal of such fiduciary.

(Emphasis added).

## THE PLAN

38.    The Plan is "employee pension benefit plan" as defined by §§ 3(3) and (3)(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

39.    The Plan is legal entities that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

40.    In this action for breach of fiduciary duty, the Plan is neither a plaintiff nor a defendant. Rather, Plaintiffs request relief for the benefit of the Plan and for the benefit of its Participants.

41.    The Plan is "defined contribution plan" or "individual account" Plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to the Participants' account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participants' accounts. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

42.    The Plan is a voluntary contribution Plan whereby Participants make contributions to the Plan ("Voluntary Contributions") and direct the Plan to purchase investments with those contributions from options pre-selected by Defendants which are then allocated to Participants' individual accounts.

43.    Upon information and belief, the Company's SEC filings were incorporated into the Company's Summary Plan Description ("SPD"). By incorporating the Company's SEC

filings into the SPD, these documents (*i.e.*, Form 8-Ks, Form 10-Qs and Form 10-Ks) were fiduciary communications with Plan Participants.

**The Plan Fiduciaries**

44.    ***Named Fiduciaries***.    ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).    The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.    ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

45.    ***De Facto Fiduciaries***.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.    Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."    ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

46.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its Participants under ERISA in the manner and to the extent set forth in the governing the Plan documents, through their conduct, and under ERISA.

47.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's Participants and beneficiaries and with the care, skill, prudence, and diligence under

the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

48.     Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

## FACTUAL BASIS OF THE FIDUCIARY BREACHES

49.     Defendant Coventry operates as a managed healthcare company via health plans, insurance companies, and network rental and workers' compensation services companies. The Company offers risk and fee-based managed care products and services to a broad cross section of individuals, employer and government-funded groups, government agencies, and other insurance carriers and administrators through its Commercial Business, Individual Consumer & Government Business, and Specialty Business divisions via a direct sales staff and a network of independent brokers.

50.     Coventry's Commercial Business division product line includes: (i) its health maintenance organization ("HMO"); (ii) preferred provider organizations ("PPO"); and (iii) point of service products.  This division also offers commercial management services products and consumer-directed benefit options, including health reimbursement accounts and health savings accounts.

51.     The Company's Individual Consumer and Government division offers health benefits to members participating in the Medicare Advantage HMO, Medicare Advantage PPO, Medicare Advantage Private-Fee-For-Service, Medicare Prescription Drug, and Medicaid

programs. This division also provides fully-insured managed care services, as well as other products and services, such as pharmacy benefit management, clinical management, and fiscal intermediary services.

52.    Coventry's Specialty Business division offers various products, including access to provider network, pharmacy benefits management, field case management, telephonic case management, independent medical exam, and bill review capabilities; and network rental services and other managed care products through a PPO network to national, regional, and local third party administrators and insurance carriers. This division also includes mental-behavioral health benefits business and dental benefits business.

## A.    Background

53.    On December 6, 2006, prior to the Class Period, at the Company's Investor Day with securities analysts and investors (which included Plan Participants), the Company's executive management explained that while the Commercial Business division had been the cornerstone of its business, going forward, much of its growth would emanate from its Individual Consumer and Government division. Fran Soistman, the Company's Executive Vice President, announced that the Company had recently launched its Medicare Private-Fee-For-Service ("PFFS") initiative:

> Medicare Part D was the first time that Coventry embarked on a national Medicare initiative. And the success that we have realized thus far with Medicare Part D was the model that we replicated for Private-Fee-for-Service, which we launched three weeks ago.
>
> I would depict the Medicare business growth engine as one that has the capacity. It has the horsepower. It has a track record, both with the Medicare Advantage business of delivering consistent performance, both top line and bottom line. But, the Medicare Part D was, perhaps, the first time we really opened it up and showed you what we could do on a much larger scale. And obviously, we look to replicate that with Medicare Private-Fee-for-Service.

*        *        *

> Let's move on to the Private-Fee-for-Service product, our new product, again branded as Advantra Freedom. Well, let's start with taking success on the Part D side and replicating that on the Private-Fee-for-Service side. We learned a lot, we did a lot of things right on Part D and we're replicated that for Private-Fee-for-Service starting with dedicated leadership and bringing the entire organization together. It's what you've come to expect from Coventry, the IT folks, they respond, they get the job done. Customer service organization, they respond, they get the job done. It's all that happens behind the scenes that you never really hear about, but trust me, none of this is possible if it didn't happen. So that's in place, we're very pleased with our readiness for private fee.

54. The Company's Form 10-K for the year ended December 31, 2006, contained the following description of the product:

> Commencing January 1, 2007, the Company will offer Medicare Advantage Private Fee for Service ("PFFS") plans in 43 states under the name Advantra Freedom. These plans are offered under a contract with [The Centers for Medicare & Medicaid Services] and provide enrollees with all benefits they receive under Original Medicare plus additional benefits such as preventive care and eyeglasses/hearing aid coverage and pharmacy benefits. Enrollees are not limited to network providers, but may utilize any provider willing to accept the plan's terms and conditions. Providers generally receive the same reimbursement as under original Medicare. The Company's products will be underwritten by its health insurance subsidiaries.

55. Accordingly, at the start of the Class Period, the Company's future growth prospects were highly dependent on its new Medicare PFFS initiative. In early 2007, securities analysts noted that the key theme for the Company's outlook was its push into the Medicare PFFS market as the membership and growth of its Commercial business had stalled. In fact, in a February 2007 research report, JP Morgan Securities referred to Coventry's Commercial business as it "*Achilles heel.*"

56. During the Class Period, Defendants issued numerous inaccurate statements which failed to disclose that the Company engaged in an undisclosed under-pricing practice to obtain new Medicare PFFS members. Throughout the Class Period, Defendants created the appearance that the Company's new Medicare PFFS initiative was capable of the high growth

necessary to offset the Company's contracting Commercial business.

57.     Defendants knew or recklessly failed to disclose the true risks associated with Coventry's Medicare PFFS under-pricing strategies, including the fact that while the Company's Medicare PFFS products were rapidly gaining market share, such gains were having a material adverse effect on the Company's profit margins and profitability.  The true negative effects of such practice on the Company's profitability and profits margins were masked by improper claims assumptions that understated the Company's health care claim costs.

58.     The Company's under-pricing strategies and other deceptive practices did not reflect its true "medical loss ratio" ("MLR").  The MLR, or the ratio of expenses of providing healthcare services expressed as a percentage of insurance premiums, is a significant and closely watched financial indicator of healthcare companies. Generally, a low medical loss ratio is rewarded on Wall Street by higher stock prices since it indicates that a lower fraction of revenues are spent paying health care claims, translating into greater profits.

59.     During the Class Period, Defendants issued inaccurate statements about the Company's business, while failing to disclose adverse longer term trends.  Defendants were also issuing positive inaccurate statements about the Company as insiders collectively sold more than 800,000 Coventry Stock in excess of $46 million.

## BREACHES OF FIDUCIARY DUTIES

60.     On February 9, 2007, the Company issued a press release and announced its financial results for the fourth quarter and year ended December 31, 2007.  The Company also announced that was increasing its 2007 Medicare PFFS membership growth expectations by 65% to 90,000-100,000 members.

61.     On that same day, the Company held a conference call for investors (which

included Plan Participants) and securities analysts.     Defendants discussed the Company's

Medicare PFFS initiative:

### Defendant Wolf:

On Private Fee-For-Service, our team has built a terrific new business for us.  We will likely wrap up January with something just over 70,000 new members.  We expect to exceed 85,000 new members by the end of the first quarter and somewhere between 90,000 and 100,000 members by year-end.

### Defendant Guertin:

Cash flow from operations is outstanding, and health plan reserves are stable.    Our most significant growth initiative of 2006, Medicare Part D, has produced outstanding results, both top line and bottom line, and our newest growth initiative, Medicare Private Fee-For- Service, is off to a roaring start.

*        *        *

*In addition, as you heard Dale describe, we are exceeding our expectations on Medicare Private Fee-For-Service, both in terms of the total membership and how quickly it is coming on board.* During the quarter, we spent a little over $7 million in support of the Medicare Private Fee-For-Service implementation.

*        *        *

*From a business perspective, the most significant changes in the guidance are in the area of Medicare Private Fee-For-Service and commercial risk revenue.  On Medicare Private Fee- For- Service, our previous guidance had assumed 50,000 to 65,000 members with associated revenue of approximately $500 million. We now believe that we will get to 90,000 to 100,000 members by year-end and produce revenue closer to $700 million.*

Partially offsetting this revenue gain is a reduced revenue outlook for commercial risk, based on the expected loss of risk membership in the first quarter of 2007.  While we expect to claw our way back towards flat by the end of the year as we have in the past, the lower-than expected risk membership during the year will bring the commercial risk revenue down from our previous expectation.

*        *        *

### Carl McDonald, Analyst, CIBC:

First question is on Private Fee-For-Service, and essentially, it is -- does the much better than -- expected growth there make you nervous in the sense that my analysis of some of the benefit designs and rates in the Private Fee-For-Service would suggest that you guys are offering better benefits at a lower cost than many of the competitors.  So, how much of that do you think is influencing the growth, as opposed to distribution or some other advantage that you think you have?

**Defendant Wolf**:

You know, when I was in my old job, Carl, I would have been nervous; now that I'm in my new job, I don't do nervous anymore; that's Shawn's job.

You know, all I can tell you is that I think we put a pretty attractive product on the market in Part D in 2006. It wasn't the most attractive product on the market, but it was a pretty attractive product, *and it turned out we hit it just right in reaching balance between profitability and growth*.

Can I ever been 100% sure that we didn't err slightly on one side or another? Of course not. But I have a high degree of confidence in our financial and actuarial teams who built this. We didn't take any different approach to it than we did in the Part D or any of our other businesses, frankly, and we are not confused about -- in this Company about profitability comes first and growth comes second.

So I feel very good about it. We'll see -- time will tell.

(Emphasis added).

62.    On March 15, 2007, the Company issued a press release and announced that it had

won a 35,000 member Medicare PFFS employee-sponsored retiree contract. The press release

stated in relevant part:

Coventry Health Care Selected by the State of West Virginia Public Employees Insurance

Agency to Provide Retiree Health Benefits Advantra Freedom Plan Preserves Current Benefits for Retirees and Spouses

BETHESDA, Md. -- (BUSINESS WIRE) -- March 15, 2007 -- Coventry Health Care, Inc. (NYSE: CVH) today announced that it was selected by the state of West Virginia's Public Employees Insurance Agency (PEIA) as the state's Medicare Advantage plan to provide health insurance for its 35,000 retirees effective July 1, 2007.

"We are extremely pleased to expand our relationship with PEIA," said Fran Soistman, Jr., executive vice president of Coventry Health Care. "Coventry Health Care and its Charleston based Carelink Health Plan have a long-standing relationship with PEIA's active employees, so we look forward to also serving its retirees and spouses." In addition to PEIA, Coventry serves approximately 80,000 other West Virginians through its commercial, Medicare Advantage and Medicaid programs.

"The goal is to take care of our retirees who have taken care of the state over the years, and with Coventry's health plan and their national presence, we can do just that," said Ted Cheatham, director of West Virginia Public Employees Insurance Agency. "Not only does this help us preserve the level of benefits for our retirees, but it helps the state slow the growth of future liabilities in

funding retiree benefits. It's a win for our retirees, our state and our taxpayers."

Under the customized retiree benefit plan, both medical and prescription drug (Medicare Part D) coverage will be offered, including several drugs excluded from the Part D formularies. There is freedom to choose any provider with this plan, along with access to a 24-hour nurse line, enhanced clinical programs (voluntary disease and case management programs), and fitness programs. The retiree benefit plan also will offer free health risk assessments, social worker support and targeted support for those with serious medical needs.

63.    On March 19, 2007, Defendant Guertin spoke at a Lehman Brother Global

Healthcare Conference:

Looking more specifically at the Medicare outlook for 2007, we are at or better than expectations, really for all three of our Medicare product lines, and our traditional HMO membership will be up 5% to 10%. Part D revenue will probably grow around 10% year over year. And we'll exceed our expectations and probably just about anyone's expectations on private fee-for-service with 135,000 new members and new revenue in excess of $900 million this year.

64.    On April 27, 2007, the Company issued a press release and announced its

financial results for its first quarter of 2007. For the quarter, the Company reported operating

revenues of $2.24 billion and net earnings of $121.7 million, or $0.76 per diluted share.

Defendant Wolf stated in relevant part:

We are right on track for another year of strong growth in revenue and earnings per share. In the first three months of the year we announced a meaningful acquisition, repurchased four million shares, refinanced debt at favorable rates, and successfully launched Medicare PFFS. *We were able to accomplish all of these things while continuing to deliver the strong operational and financial results you have come to expect.*

(Emphasis added).

65.    The Company's financial results for its 2007 first quarter were also repeated in

the Company's Form 10-Q filed with the SEC on or about May 10, 2007 (the "2007 1Q Form

10-Q"), which was signed by Defendants Wolf and Guertin. The 2007 1Q Form 10-Q

represented in relevant part:

Individual Consumer & Government Business Division

Government revenue increased as a result of increased Medicare-Private-Fee-For-Service membership, Medicare Part D membership, and Medicaid membership. Medicare Part D revenue includes $66.2 million attributable to the estimation of Centers for Medicare and Medicaid Services (CMS) risk sharing payments. This risk sharing revenue represents the amount we would receive from CMS if we settled with CMS as of the end of the first quarter. *We expect the Medicare Part D program to be profitable on a full year basis and, as a result, expect that the risk-sharing revenue related to the 2007 contract year will reverse itself later in the year and will eventually be insignificant as of year end.*

Medicare risk premium yields per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products as well as from increases in risk factor adjustment scores for certain of our Medicare products. This average premium yield increase was partially offset by the addition of the new Medicare Private-Fee-For-Service business which has a lower premium yield than our

existing Medicare Advantage business, given our individually distributed PFFS products generally do not include a pharmacy benefit. Medicaid premium yields increased as a result of rate increases in Missouri, our largest Medicaid market.

The increase in gross margin is driven by the increased business discussed above and is offset by the increased medical costs associated with this increased business. Medicare risk medical costs as a percentage of premium revenue increased over the prior year quarter as a result of the addition of new Medicare Private-Fee-For-Service business, which has a higher medical loss ratio given our individually distributed Private-Fee-For-Service products generally do not include a pharmacy benefit. Medicare Part D medical costs as a percentage of premium revenue has decreased over the prior year quarter as a result of favorable pharmacy cost trend as members move to generic brands. Medicaid medical costs as a percentage of premium revenue increased over the prior year quarter as a result of an increase in large claims incurred in Missouri, our largest Medicaid market.

(Emphasis added).

66.    With regard to the Company's outlook, the 2007 1Q Form 10-Q stated:

Individual Consumer & Government Division -- our new product for 2007, Private-Fee-For- Service, is off to a very robust start and is being offered in 43 states. *By year-end, we are expecting 135,000 new members and almost $1 billion of new revenue.*

(Emphasis added).

67.    The 2007 1Q Form 10-Q also stated: "Based upon our valuation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and

procedures are effective." Defendants Wolf and Guertin certified the accuracy of the Company's disclosure and internal control representations with the SEC in the 2007 1Q Form 10-Q.

68.     On July 31, 2007, the Company issued a press release and announced its financial results for its second quarter of 2007. The Company reported operating revenues of $2.33 billion and net earnings of $151.3 million, or $0.96 per diluted share. Defendant Wolf stated in relevant part:

> *I am pleased to report another strong quarter from our well-diversified portfolio of businesses.* The Commercial Business division reported an outstanding medical loss ratio, the Individual Consumer & Government Business division continued to display impressive growth, and the Specialty Business division performed very well as we successfully integrated the Concentra workers' compensation services businesses. In addition to delivering these reliable financial and operational results, we continue to deploy capital strategically and position the Company for future growth opportunities.

69.     The Company's financial results for its 2007 second quarter were repeated in the Company's Form 10-Q filed with the SEC on or about August 8, 2007 (the "2007 2Q Form 10-Q"), which was signed by Defendants Wolf and Guertin. The 2007 2Q Form 10-Q stated in relevant part:

> Individual Consumer & Government Business Division
>
> Quarters and Six Months Ended June 30, 2007 and 2006
>
> Government revenue increased for the quarter and six months ended June 30, 2007 from the same period in 2006 as a result of new membership from the Medicare PFFS business as well as the increased Medicare Part D, Medicaid and Individual membership. Medicare Part D revenue includes adjustments attributable to the estimation of Centers for Medicare & Medicaid Services ("CMS") Risk Sharing payments. The quarter ended June 30, 2007 includes a reduction of revenue of $31.7 million while the six months ended June 30, 2007 includes additional revenue of $34.5 million; these amounts are primarily related to the 2007 rate year. This risk sharing revenue represents the amount we would receive from CMS if we settled with CMS as of the end of the second quarter. We expect the Medicare Part D program to be profitable on a full year basis and, as a result, expect that the risk-sharing revenue related to the 2007 contract year will continue to reverse through the year. Medicare risk premium yields per member per month increased as a result of the rate increases from the annual

competitive bid filings for our Medicare Advantage products as well as from increases in risk factor adjustment scores for certain of our Medicare products.

This average premium yield increase was partially offset by the addition of the new Medicare Private-Fee-For-Service business which has a lower premium yield than our existing Medicare Advantage business, since our individually distributed PFFS products generally do not include a pharmacy benefit. Medicare Part D premium yields have declined for both the three and six months ended June 30, 2007 compared to the same periods in 2006 primarily due to the lower CMS risk sharing accruals. The six months ended June 30, 2007 included $34.5M compared to $56.7 million for the same period in 2006. Medicaid premium yields increased as a result of rate increases in Missouri, our largest Medicaid market, effective July 1, 2006.

The increase in gross margin is driven by the increased business discussed above and is offset by the increased medical costs associated with this increased business. Medicare Part D medical costs as a percentage of premium revenue have decreased over the prior year quarter as a result of favorable pharmacy cost trend due to re-negotiated pharmaceutical contracts resulting from higher enrollment and as a result of members moving to generic drugs. Medicaid medical costs as a percentage of premium revenue increased over the prior year quarter as a result of an increase in large claims incurred in Missouri, our largest Medicaid market.

70.    The 2007 2Q Form 10-Q also stated:

For the remainder of 2007, we have the following expectations for our three business lines:

Commercial Division - we expect that on an organic basis the health plan ASO membership will be slightly down at year-end as compared to our June 30, 2007 membership and expect Commercial group risk membership in the aggregate will be slightly up at year-end as compared to our June 30, 2007 membership.

***Individual Consumer & Government Division - for our new product for 2007, Private-Fee- For-Service, we are expecting 150,000 members and more than $1 billion of revenue by year-end***.

Specialty Division - our acquisition of Concentra's workers compensation business, effective April 2, 2007 is expected to have a small favorable effect on earnings this year.

(Emphasis added).

71.    The 2007 2Q Form 10-Q also stated: "Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective." Defendants Wolf and Guertin certified the accuracy of the Company's

disclosure and internal control representations with the SEC in the 2007 2Q Form 10-Q.

72.    On October 26, 2007, the Company issued a press release and announced its

financial results for its third quarter of 2007.  The Company reported operating revenues of $2.52

billion and net earnings of $168.7 million, or $1.08 per diluted share.  Defendant Wolf stated in

relevant part:

> *I am pleased to present another quarter of impressive top and
> bottom line growth from our well-diversified portfolio of
> businesses.*    Seeking and seizing organic and acquisition
> opportunities should enable Coventry to grow operating revenue
> by more than 25% in 2007 and approaching 30% in 2008. This
> positions us well for another year of steady and reliable earnings
> growth in 2008.

73.    The Company's financial results for its 2007 third quarter were repeated in the

Company's Form 10-Q filed with the SEC on or about November 9, 2007 (the "2007 3Q Form

10-Q"), which was signed by Defendants Wolf and Guertin.

74.    The 2007 3Q Form 10-Q represented:

> Individual Consumer & Government Division
>
> Quarters and Nine Months Ended September 30, 2007 and 2006
>
> Government revenue increased for the quarter and nine months
> ended September 30, 2007 from the same periods in 2006 as a
> result of membership from our new Medicare PFFS business, as
> well as the increased Part D, Medicaid and Individual membership,
> both organic and acquired.  Part D revenue includes adjustments
> attributable to the estimation of Centers for Medicare & Medicaid
> Services ("CMS") Risk Sharing payments.  The quarter ended
> September 30, 2007 includes a reduction of revenue of $68.7
> million, while the nine months ended September 30, 2007 includes
> a reduction of revenue of $34.2 million.  The reduction of revenue
> of $34.2 million for the nine months ended September 30, 2007,
> represents the amount we would pay to CMS if we settled with
> CMS as of the end of the third quarter. We expect the Part D
> program to be profitable on a full-year basis and, as a result, expect
> that the reductions to revenue for the CMS risk-share related to the
> 2007 contract year will continue through the year.
>
> Medicare Advantage risk premium yields per member per month
> decreased as a result of the addition of our new Medicare Private-
> Fee-For-Service business, which has a lower premium yield than
> our existing Medicare Advantage business, since our individually
> distributed PFFS products generally do not include a pharmacy
> benefit. This average premium yield decrease was partially offset

by the rate increases from the annual competitive bid filings for our Medicare Advantage products, as well as from increases in risk factor adjustment scores for certain of our Medicare products. Part D premium yields have declined for both the three and nine months ended September 30, 2007 compared to the same periods in 2006 primarily due to the lower CMS risk sharing accruals as well as the annual competitive bid filings for our Part D products. The nine months ended September 30, 2007 included a reduction of revenue of $34.2 million compared to additional revenue of $15.7 million for the same period in 2006.

This change is a result of the improved profitability of the Part D program, which is discussed below. Medicaid premium yields increased as a result of rate increases in Missouri, our largest Medicaid market, effective July 1, 2006 and July 1, 2007.

The increase in gross margin was driven by the increased business discussed above and was offset by the increased medical costs associated with this increased business. Part D medical costs as a percentage of premium revenue have decreased over the prior year quarter as a result of favorable pharmacy cost trend due to re-negotiated pharmaceutical contracts resulting from higher enrollment and as a result of members moving to generic drugs. Medicaid medical costs as a percentage of premium revenue increased over the prior year nine month period as a result of an increase in large claims incurred in our Missouri market.

75.    The 2007 3Q Form 10-Q also disclosed: "Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective." Defendants Wolf and Guertin certified the accuracy of the Company's disclosure and internal control representations with the SEC in the 2007 3Q Form 10-Q.

76.    On January 7, 2008, the Company re-affirmed its earnings expectations of $1.17 to $1.18 per diluted share for fourth quarter 2007 and $4.42 to $4.58 per diluted share for full year of 2008.

77.    On February 8, 2008, the Company issued a press release and announced its financial results for the fourth quarter and year ended December 31, 2007. The Company reported operating revenues of $2.79 billion and net earnings of $184.3 million, or $1.18 per diluted share, during the fourth quarter 2007 and total revenues of $9.88 billion and net earnings of $626.1 million, or $3.98 per diluted share, for the year ended December 31, 2007. Defendant

Wolf stated in relevant part:

> *Coventry's 2007 results were characterized by strong financial and operational performance, with the fourth quarter as no exception.* Our 2007 organic growth initiatives and capital deployment activities have positioned us well for another year with industry-leading revenue growth and steady and reliable earnings results.

(Emphasis added).

78.    The Company's financial results for its 2007 fourth quarter and fiscal year were repeated in the Company's Form 10-K filed with the SEC on or about February 28, 2008 (the "2007 Form 10-K"), which was signed by Defendants Wolf and Guertin.

79.    The 2007 Form 10-K represented:

> Managed care premium revenue increased in both our Individual Consumer & Government and Commercial divisions. *The growth is a result of our new Medicare PFFS product, growth in existing products as well as from the acquisitions; each of which is described above.* Partially offsetting the increase was a decline in same store Commercial risk membership over the prior year period.

> Management services revenue increased compared to the prior year as a result of the acquisition of Concentra and Mutual described above. This increase was partially offset by membership losses in our Commercial Division's National Accounts business.

> Medical costs increased almost exclusively as a result of new business in both our Individual Consumer & Government Division and Commercial Division discussed above. Medical costs as a percentage of premium revenue ("medical loss ratio") increased 0.3% from the prior year as a result of slightly higher medical loss ratios, associated with acquired businesses and from our new Medicare PFFS business which has a slightly higher medical loss ratio than our overall business.

80.    The 2007 Form 10-K also represented:

> Coventry's management, including the principal executive officer and principal financial officer, is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting (as defined in Rule 13a-15(f) under the U.S. Securities Exchange Act of 1934) is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

> Internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in

reasonable detail, accurately and fairly reflect the transactions and dispositions of the Company's assets; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that the Company's receipts and expenditures are being made only in accordance with authorizations of the Company's management and directors; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

Coventry's management has performed an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2007 based on criteria established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Controls - Integrated Framework, and believes that the COSO framework is a suitable framework for such an evaluation. Management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2007.

*   *   *

We have performed an evaluation as of the end of the period covered by this report of the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934 ), under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer. Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

81.    Defendants Wolf and Guertin certified the accuracy of the Company's disclosure and internal control representations with the SEC in the 2007 Form 10-K.

82.    On March 17, 2008, the Company issued a press release that adjusted its 2008 guidance:

BETHESDA, Md. -- (BUSINESS WIRE) -- March 17, 2008 -- Coventry Health Care, Inc. (NYSE: CVH) today announced that, after completing an analysis of financial results through February 2008 and a thorough review of each of the Company's lines of business, the Company expects full year GAAP earnings per share (EPS) on a diluted basis of $4.39 to $4.50, or growth of 10% to

13% from 2007. While still early in the year, the Company is pleased to report that all lines of business are performing well and that the underlying fundamentals continue to be sound.

The Company will present at the Lehman Brothers Global Healthcare Conference in Miami, Florida, at 1:30 p.m. ET on Tuesday, March 18, 2008. The public may access a live webcast of the presentation and accompanying slides (which are being posted on the Investor Relations page of the Company's website simultaneously with the issuance of this press release) which will review highlights of the Company's business performance and financial outlook including the following:

--    The Company's view of stable commercial medical cost trends remains unchanged and the commercial group risk medical loss ratio (MLR) in 2008 is expected to be approximately flat as compared to 2007 on a "same store" basis.

--    The Company has experienced positive development on the December 2007 medical claims reserves at a level consistent with the Company's expectations. Therefore, based upon data from the first two months of 2008, the Company's estimates of medical costs incurred in 2007 appear to have been accurate.

--    Medicare Part D results remain on track with no changes to the expected full year MLR in the low 80%'s and first quarter MLR of approximately 104%.

--    The Company has added approximately 29,000 Medicare Advantage members in the first two months of 2008 and forecasts Medicare Advantage performance consistent with previous expectations, excluding the impact of influenza-related costs in Q1 2008 as discussed below.

--    The Company's Medicaid risk business is performing on track with previous guidance.

The Company has been monitoring the impact of the following matters and has identified two developments which differ from our previous expectations:

--    Influenza levels in the first quarter of 2008 have been elevated to date but appear to be subsiding as of March 15, 2008. The Company expects the impact of influenza-related medical costs across all lines of business to be approximately $10.0 million higher ($0.04 per diluted share) than originally anticipated in its forecast for the first quarter of 2008. This matter is expected to only impact the first quarter of 2008.

--    As a result of recent Federal Reserve actions to reduce the Federal Funds Rate, the Company has experienced greater than anticipated downward pressure on net investment income in the first quarter of 2008. The Company also expects continued downward pressure for the remainder of the year as the Federal Reserve continues to reduce the Federal Funds Rate. The Company expects net investment income will be $9.0 million lower ($0.04 per diluted share) than previously expected with the

impact generally being realized evenly throughout each quarter of 2008.

"Not withstanding the downward adjustment to our full year EPS range, we are very pleased with the consistent performance and strong, fundamentally sound positioning of our ongoing businesses," said Shawn Guertin, chief financial officer of Coventry Health Care. "We continue to feel confident about each of our business lines, the results of our recent acquisitions, the success of our organic growth initiatives and our long term strategic positioning."

Accordingly, the Company is providing revised consolidated guidance for full year 2008 as follows:

\*       \*       \*

-- Consolidated revenues of $11.99 billion to $12.49 billion

-- Consolidated MLR% of 79.9% to 80.3%

-- Cost of sales expense of $160.0 million to $180.0 million

\*       \*       \*

-- GAAP EPS on a diluted basis of $4.39 to $4.50.

83. On April 25, 2008, the Company issued a press release and announced its financial results for its first quarter of 2008. The Company reported operating revenues of $2.94 billion and net earnings of $125 million, or $0.81 per diluted share. The Company also reiterated its 2008 earnings guidance. Defendant Wolf stated in relevant part:

Consistent with our comments in mid-March, *we are pleased to confirm that our businesses continue to perform well and are fundamentally sound.* We are on track for another year of industry leading revenue growth and remain very confident about our strategic positioning and growth prospects for the future.

(Emphasis added).

84. The Company's financial results for its 2008 first quarter were repeated in the Company's Form 10-Q filed with the SEC on or about May 12, 2008 (the "2008 1Q Form 10-Q"), which was signed by Defendants Wolf and Guertin.

85. The 2008 1Q Form 10-Q represented in relevant part:

Individual Consumer & Government Division

Individual Consumer & Government Division revenue increased from the prior year quarter as a result of membership growth from our Medicare Advantage business, as well as increased Medicare

Part D, Medicaid and Individual membership, both organic and acquired.

Medicare Advantage risk premium yields, excluding the impact of revenue ceded to external parties, per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products. With the effect of the ceded revenue being included in the premium yield, the Medicare Advantage risk premium yields per member per month decreased to $753.55 in 2008 from $810.08 in 2007. The decrease is a result of a larger portion of our Medicare Private-Fee-For-Service ("PFFS") business in 2008 being ceded to external parties through quota share arrangements. This average premium yield decrease was partially offset by the annual competitive bid filings noted above.

Part D premium yields, excluding the impact of CMS risk sharing premium adjustments and revenue ceded to external parties, have declined in the first quarter of 2008 compared to same quarter of 2007 primarily due to the annual competitive bid filings for our Part D products as well as the mix of products sold. Including the effect of the CMS risk sharing premium adjustments as well as the ceded revenue, the yields were $110.73 in 2008 compared to $119.84 in 2007.

When reviewing the premium yield for Medicare Advantage and Part D business, adjusting for the ceded revenue is useful for comparisons to competitors that may not have similar ceding arrangements. When reviewing the Medicare Part D business, adjusting for the risk share amounts is useful to understand the results of the Part D business because of our expectation that the risk sharing revenue will eventually be insignificant on a full year basis.

Medicaid premium yields increased as a result of a rate increase in Missouri, our largest Medicaid market, effective July 1, 2007, as well as the inclusion in our results of Vista, which has a higher Medicaid premium yield.

The increase in gross margin was driven by the membership growth, both organic and acquired, as discussed above, partially offset by the increased medical costs associated with this membership growth. Medicare Part D medical costs as a percentage of premium revenue have increased over the prior year quarter as a result of a widening of the risk corridors and growth in our low-income auto-assign population in 2008. Medicaid medical costs as a percentage of premium revenue decreased over the prior year quarter as a result of the premium yield increases discussed above.

86.    The 2008 1Q Form 10-Q also represented:

We are forecasting growth in diluted earnings per share of 10% to 13% in 2008.

With respect to our business divisions:

Commercial Division -- After our membership loss in the first quarter, we expect to grow commercial risk membership for the remaining three quarters of 2008 and remain relatively flat compared to December 31, 2007.  The commercial group risk medical loss ratio is expected to be in the mid to high 78%'s, including the effect of acquisitions.

Individual Consumer & Government Division -- This division is expected to have another year of strong growth.  We expect continued growth in Medicare Advantage in 2008 and we are expecting 100,000 new members in 2008, including a large group effective May 1, 2008.

Medicare Part D increased approximately 150,000 members in the first quarter of 2008. We expect the Medicare Part D membership to be level for the remainder of the year.  With respect to Medicaid, as previously disclosed, we were notified of the termination of our Pennsylvania Medicaid behavioral health contract representing approximately 107,000 members, effective July 1, 2008. Given the nature of this globally capitated contract, we earn a low single digit operating margin. Our core Medicaid risk business performed well in the first quarter of 2008 and we expect that to continue throughout 2008.

Specialty Division - Our workers' compensation services continue to experience meaningful year over year growth and we expect this to continue throughout 2008. We continue to seek additional strategically related businesses for this division, most recently acquiring MHNet, a mental-behavioral health company, as discussed above.

87.    The 2008 1Q Form 10-Q also represented:  "Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective."  Defendants Wolf and Guertin certified the accuracy of the Company's disclosure and internal control representations with the SEC in the 2008 1Q Form 10-Q.

88.    On June 18, 2008, the Company issued a press release and announced that it had revised its 2008 outlook, reducing second quarter and full year 2008 earnings per share estimates.  The press release stated in relevant part:

Based upon a review of each line of business, the Company has observed and quantified the following developments contributing to the revised expectations and guidance:

-- Medicare Advantage Medical Loss Ratio (MLR). The Company expects the 2008 Medicare Advantage medical loss ratio to be between 85.5% and 85.9%, an increase of approximately 300 to 340 bps from the Company's prior estimate. The driver of this change is the Company's Medicare Advantage Private Fee-for-

Service (PFFS) business.  The Company has received a much higher than expected level of PFFS claims related to prior periods, which is inconsistent with claims submission patterns of network-based Medicare Advantage products. As a result, the Company is projecting negative development of PFFS reserves related to 2007 of approximately $50.0 million.  The Company is forecasting the overall Medicare Advantage MLR to be between 87.2% and 87.6% for the first half of 2008, inclusive of the negative development outlined above and a revised view on 2008 PFFS performance. The Company is forecasting the overall Medicare Advantage MLR to be between 84.0% to 85.0% for the second half of 2008.  The higher than previously expected Medicare Advantage MLR has resulted in a reduction of $0.42 per diluted share to the midpoint of the Company's 2008 EPS guidance.

--    Commercial Group Risk MLR. The commercial group risk MLR is being pressured by higher than expected levels of outpatient utilization and, to a lesser extent, a higher than expected inpatient unit cost trend caused by an increased severity level of facility claims. The Company's revised 2008 health plan commercial group risk MLR forecast is approximately 80.3% versus previous guidance of approximately 78.8%. Based upon estimates through May 2008, the Company expects the second quarter MLR to be in the range of 82.3% to 82.7% with the first half of 2008 MLR in the range of 80.6% to 80.8%. The second half of 2008 is expected to run at an MLR of approximately 80.0%. The Company has initiated forward pricing action to reflect the higher than expected trend.  The higher than previously expected commercial group risk MLR has resulted in a reduction of $0.32 per diluted share to the midpoint of the Company's 2008 EPS guidance.

--    Other Modifications.  The Company is revising its revenue outlook from a midpoint of 23.9% growth over the prior year to a midpoint of 20.7%.  The reduction in risk revenue guidance is primarily driven by the full year outlook on commercial group risk membership which is expected to be down by approximately 4.0% from prior year (although slightly up for the remainder of 2008 as compared to Q108), and an anticipation of Medicare Advantage membership growth in 2008 of approximately 90,000 members compared to a previous forecast for growth of 100,000 members. The decrease in management services revenue guidance is driven by a lower than expected level of bill volume in the Company's workers' compensation services business.    Offsetting these decreases to the top-line are forecasted reductions in operating costs, including actions planned by the Company, and improvements in non-operating items.  These modifications to operating items have resulted in a reduction to the midpoint of the Company's 2008 EPS guidance of $0.09 per diluted share which is offset by the favorable $0.09 per diluted share impact of the non-operating changes to the Company's 2008 EPS guidance.

89.    Defendant Wolf stated in relevant part:

> We are very disappointed with the April and May 2008 results and their anticipated effect on the second quarter and the full year. We have implemented corrective actions that we anticipate will put us back on an acceptable EPS growth path for 2009 and beyond.

90.     In response to the Company's earnings announcement, the price of the Company's Stock declined by more than 22% from $40.00 to $31.30 per share on very heavy trading volume.

91.     On July 25, 2008, the Company issued a press release and announced its financial results for its second quarter of 2008. The Company reported operating revenues of $2.98 billion and net earnings of $83.2 million, or $0.55 per diluted share.

92.     Coventry's financial results for its 2008 second quarter were repeated in the Company's Form 10-Q filed with the SEC on or about August 7, 2008 (the "2008 2Q Form 10-Q"), which was signed by Defendants Wolf and Guertin.

93.     The 2008 2Q Form 10-Q represented:

> Individual Consumer & Government Division
>
> Quarters and Six Months Ended June 30, 2008 and 2007
>
> Individual Consumer & Government Division revenue increased for the quarter and six months ended June 30, 2008 from the same periods in 2007 as a result of membership growth from our Medicare Advantage business, as well as increased Medicare Part D, Medicaid and Individual membership, both organic and acquired.
>
> Medicare Advantage risk premium yields, excluding the effect of revenue ceded to external parties, per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products as well as from increases in risk factor adjustment scores for our Medicare Advantage products. With the effect of the ceded revenue being included in the premium yield, the Medicare Advantage risk premium yields per member per month for the six month period ending June 30 decreased to $747.36 in 2008 from $802.97 in 2007. The decrease is a result of a larger portion of our Medicare PFFS business in 2008 being ceded to external parties through quota share arrangements. This average premium yield decrease was partially offset by the annual competitive bid filings and risk factor scores noted above.
>
> Part D premium yields for the six month period ending June 30, 2008 excluding the effect of CMS risk sharing premium

adjustments and revenue ceded to external parties, have declined in 2008 compared to 2007 primarily due to the annual competitive bid filings for our Part D products as well as the mix of products sold. Including the effect of the CMS risk sharing premium adjustments as well as the ceded revenue, the yields were $92.60 in 2008 compared to $99.26 in 2007.

When reviewing the premium yield for Medicare Advantage and Part D business, adjusting for the ceded revenue is useful for comparisons to competitors that may not have similar ceding arrangements. When reviewing the Medicare Part D business, adjusting for the risk share amounts is useful to understand the results of the Part D business because of our expectation that the risk sharing revenue will eventually be insignificant on a full year basis.

Medicaid premium yields increased for the quarter and six month 2008 periods as a result of a rate increase in Missouri, our largest Medicaid market, effective July 1, 2007, as well as the inclusion in our results of Vista, which has a higher Medicaid premium yield.

The decrease in gross margin for the quarter ended June 30, 2008 was driven by increased medical costs associated with our Medicare PFFS business in 2008. This decrease is partially offset by higher gross margins for our Medicaid HMO and Individual businesses associated with the membership growth, both organic and acquired, as discussed above. Medicare Part D medical costs as a percentage of premium revenue have increased over the prior year quarter as a result of a widening of the risk corridors and growth in our low income auto-assign population in 2008. Medicaid medical costs as a percentage of premium revenue decreased over the prior year quarter as a result of the premium yield increases discussed above.

94.    The 2008 2Q Form 10-Q also disclosed:

Within our suite of Medicaid products, as previously disclosed, we were notified of the termination of our Pennsylvania Medicaid behavioral health contract representing approximately 107,000 members, effective July 1, 2008. Given the nature of this globally capitated contract, we earned a low single digit operating margin. Our core Medicaid risk business performed well in the first half of 2008 and we expect that to continue throughout 2008.

95.    The 2008 2Q Form 10-Q also disclosed: "Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective." Defendants Wolf and Guertin certified the accuracy of the Company's disclosure and internal control representations with the SEC in the 2008 2Q Form 10-Q.

96.    The statements referenced above were inaccurate when made because they

misrepresented and failed to disclose at least the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    that the Company employed under-pricing strategies to create the appearance that its new Medicare PFFS initiative was capable of driving the high growth necessary to offset Coventry's contracting Commercial business;

(b)    that the Company failed to disclose the true risks associated with its under-pricing strategies, including the fact that the Company was generating new Medicare PFFS membership at the expense of profit margins and profitability;

(c)    that the true negative affects of the Company's under-pricing strategies were masked by improper claims assumptions that materially understated the Company's healthcare claim expenses;

(d)    that the Company's disclosure and internal controls representations, and Defendants Wolf's and Guertin's certifications thereon, were inaccurate when made;

(e)    and that, as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its prospects and earnings guidance during the Class Period.

97.    On October 21, 2008, the Company issued a press release and announced its financial results for its third quarter of 2008. The Company reported operating revenues of $2.98 billion and net earnings of $85.5 million, or $.58 per diluted share. Defendant Wolf stated in relevant part:

> Our results for 2008 are unacceptable, and a great disappointment to me and the entire Company. However, we have identified and understand the issues that have affected our results. We have implemented a corrective action plan which we expect will increasingly be reflected in the Company's results throughout 2009 and fully realized in 2010. Most importantly, I continue to have confidence in our future prospects, both strategically and financially.

98.     Defendant Guertin, on a conference call, stated:

> Make no mistake here, we have identified the areas pressuring operating results this year, and have implemented action plans to improve our performance.  What we cannot change here is the calendar, which impacts the timing of when we see the positive impacts of all of our actions, nor can we control the unprecedented economic factors that seem to impact the landscape each and every day.
>
> As you saw in the press release, upon observing higher than expected medical loss ratios on commercial in the third quarter, we once again tore apart each of our commercial health plans to get at the drivers of this pressure.  Here we had the benefit of an additional quarter of completed data from 2008 for our analysis. There were four key conclusions that have emerged from this review; one, following the second quarter we believed the core medical trend in 2008 was 150 basis points higher than expected. The good news here is that the third quarter review showed that the core medical trends results were no worse than this.  This is very important.
>
> As you know, we implemented forward pricing action earlier this year assuming 150 basis points of elevated trend, and some additional margin for any further deterioration.  This estimate still appears accurate, and as it pertains to the core medical trend we have not seen any further deterioration.
>
> The second conclusion was that we were experiencing some additional MLR pressure that we tracked back to more subtle pricing and underwriting issues in two specific health plans. The nature of the issues we uncovered are not simple, easy to identify issues like "I wanted a certain price, and that price was cut". They have more to do with the interplay between underwriting risk assessment and pricing factors as well as some of the more detailed factors in the underwriting and pricing model itself.
>
> The nature of most of these items is not that business that was written was unprofitable, rather it was less profitable than it had been historically and less profitable than what we assumed in our forecasts.  The impact of these issues added 70 basis points to our outlook on full year commercial MLR. Needless to say, as a result of these reviews, all the changes needed to address these issues have been put in place as we speak today.
>
> The third conclusion was that having a full year of Vista versus three plus months last year was having a bigger impact on the commercial MLR than we had previously thought.  You will recall that our prior guidance assumed that the MLR in 2008 would be 50 basis points higher than 2007, due to this factor.  An examination of updated experience for this year shows that this will be closer to 95 basis points or an increase of 45 basis points from our previous estimate. Let me be clear on this topic, this is still a very good and important asset for the company, and I have every confidence in the team we have in place in south Florida.  It is the nature of this

business that this calendar year's results are largely a reflection of operating action taken prior to our ownership.

The final conclusion from this review was that we had seen significant MLR deterioration on our federal employee HMO business. This is not mail handlers, but rather the risk HMO business we're in out of each of our health plans. As you all know this business is what we refer to as slice where we are one of multiple options. It would appear at this point that we have experienced a significant degree of adverse selection in the most recent renewal cycle, which has caused the MLR deterioration in this block of business. The overall impact of this issue is an increase of 25 basis points from our previous MLR guidance. We have already set our participation in this program for 2009, and while we have made some changes to premiums and benefits, the jury is still out on what will happen to this block from both a membership and MLR perspective in 2009. But clearly, any ongoing result like this would warrant consideration of a different path for 2010.

Let me conclude my comments on the commercial business by reiterating that our fundamental outlook on trend for 2008 and 2009 is the same as a quarter ago, at 9% plus or minus 50 basis points. As you know, we decisively implemented forward pricing action earlier this year; in addition, this quarter we have made additional pricing changes on top of this to deal with the specific issues we found. All of our health plans are actively working on initiatives to improve medical expense trend outcomes in 2009. The biggest question in my mind today is not whether we will fix this issue, but all things being equal, how much of it will show up in 2009 before it fully shows up in 2010.

Let me start out on Medicare Private Fee for Service by clarifying what this is and isn't as it pertains to the third quarter developments. This is not an issue that has anything to do with any additional reserve development back to 2007, nor is it any issue with any internal claim payment practices. Those issues were identified and fully corrected in the second quarter. It is an issue about current year 2008 performance on this product. To no surprise, revenue per member in 2008 is largely as expected. The problem, therefore, is being driven on the medical expense side and in particular on our individual products as opposed to our group products.

We are experiencing trends in 2008 of around 9% on the individual business versus a comparable expected trend in the 5% range. You will recall that on this product we pay Medicare rates to providers, so with the exception of the implementation of MS-DRGs in the fourth quarter of 2007, the variances from expected results are largely driven by higher than expected utilization, with the biggest variance being observed in the outpatient category. Looking deeper into this, we can also see that one of our particular individual plan offerings is the real culprit here. In essence our individual membership is primarily distributed across three plans; one is a richer premium bearing product, while the other two are leaner plan designs with zero premiums.

> In 2008 this richer premium bearing product is running a loss ratio in the mid to upper 90s, while the zero premium products are running in the mid to upper 80s. In our 2009 bids we have made some meaningful redesigns of this particular product in terms of where it is offered, the benefit plan design, and the corresponding premiums. The ultimate impact of these specific changes, as well as the refinement of our view on 2009 performance of Private Fee for Service in total, will clearly be front and center over the next couple of months.

99.     In response to these announcements, the price of the Company's Stock declined from $28.49 per share to $13.93 per share, or more than 51%, on very heavy trading volume.

100.    Defendants were motivated to engage in this course of conduct in order to allow them and other Company insiders to sell more than 800,000 shares of their personally-held Company Stock for gross proceeds in excess of $46 million.

## THE LAW UNDER ERISA

101.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

102.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

103.    ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

104.    These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law." They entail, among other things:

(a)    the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plan, which invested in Coventry Stock, to ensure that each investment is a suitable option for the Plan;

(b)    the duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan's sponsor; and

(c)    a duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

105.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure

to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

106.    Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

## DEFENDANTS' FIDUCIARY STATUS

107.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(l), 29 U.S.C. § 1102(a)(l).

108.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. As outlined herein, Defendants all had discretionary authority and control with respect to the management of the Plan and/or the management or disposition of the Plan's investments and assets, and/or had discretionary authority or responsibility for the administration of the Plan.

109.    During the Class Period, Defendants' direct and indirect communications with the Plan's Participants included statements regarding investments in Company Stock.    Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plan's Participants via the Company's website and the plan-related documents which incorporated and/or reiterated these statements. Defendants also acted as fiduciaries to the extent of this activity.

110.    In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

### CAUSATION

111.    Upon information and belief, the Plan suffered millions of dollars in losses in Plan benefits because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in Coventry Stock during the Class Period, in breach of Defendants' fiduciary duties.  These losses to the Plan were reflected in the diminished account balances of the Plan's Participants.

112.    Defendants are responsible for losses in the Plan benefits caused by the Participants' direction of investment in Coventry Stock, because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants provided inaccurate and incomplete information to the Plan Participants regarding the true health and ongoing profitability of the Company, thereby misrepresenting the Company's soundness as an investment vehicle.  As a consequence, Participants could not exercise independent control over their investments in Coventry Stock, and Defendants remain liable under ERISA for losses caused by such investment.

113.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Coventry Stock, eliminating such Company Stock as an investment alternative when it became

imprudent, and divesting the Plan from its holdings of Coventry Stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered.

114.    Also, reliance is presumed in an ERISA breach of fiduciary duty case. Nevertheless, to the extent that reliance is an element of the claim, Plaintiffs relied to their detriment on the misstatements and omissions that Defendants made to the Plan Participants.

### REMEDY FOR BREACHES OF FIDUCIARY DUTY

115.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Coventry Stock during the Class Period.    As a consequence of Defendants' breaches, the Plan suffered significant losses.

116.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary. . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ."  Section 409 also authorizes Asuch other equitable or remedial relief as the court may deem appropriate . . . ."

117.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants and beneficiaries in the Plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been, properly administered.

118.    Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs; (e) interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

119.    Under ERISA, each defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## CAUSES OF ACTION

## COUNT I

120.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

121.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

122.    As alleged above, Defendants were responsible, in different ways and to differing extents, for the selection and monitoring of the Plan's investment options, including the option of Company Stock.

123.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such

fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in Coventry Stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan. Defendants are therefore liable for losses incurred as a result of such investments being imprudent.

124.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

125.    Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to prevent the Plan, and indirectly the Plan's Participants and beneficiaries, from suffering losses as a result of the Plan's investment in Coventry Stock.

126.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

127.    Defendants breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage the Plan's assets with respect to offering Company Stock as an investment option in the Plan; enabling Defendants' failure to prudently manage the Plan's assets with respect to

the Plan's investments; and, having knowledge of the failure to prudently manage the Plan's assets, yet not making any effort to remedy the breach.

128.    Specifically, at least some of the Defendants had actual knowledge of Coventry's corporate malfeasance and questionable reporting and business.  In addition, in light of their high-ranking positions as high ranking officers at the Company, Defendants had/should have had constructive knowledge of these activities.

129.    Despite this knowledge, Defendants participated in each other's failures to prudently manage the Plan's assets and knowingly concealed such failures by not informing Participants that the Plan's holdings of Coventry Stock were not being prudently managed.  They also failed to remedy their mutual breaches of the duty to prudently manage the Plan's investment in Coventry Stock, despite inarguably having knowledge of such breaches.

130.    Furthermore, through their own failure to prudently and loyally manage the Plan's investment in Coventry Stock, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, Defendants enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plan's investment in Coventry Stock.

131.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

132.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

133.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

134.    As alleged above, the scope of Defendants' fiduciary duties and responsibilities included disseminating the Plan documents and information to Participants regarding the Plan and assets of the Plan.    In addition, Defendants had a duty to provide Participants with information they possessed that they knew or should have known, would have an extreme impact on the Plan.

135.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan. This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate material information regarding the Plan's investment options such that Participants can make informed decisions with regard to investment options available under the Plan, this duty applies to all of the Plan's investment options, including investment in Coventry Stock.

136.    Defendant Coventry, through its officers and directors issued a multitude of inaccurate statements through SEC filings and press releases regarding value of Coventry Stock and the financial health of the Company.

137.    Upon information and belief, such communications were disseminated directly to all Participants, which incorporated by reference the Company's inaccurate SEC filings and reports furnished by Coventry, through its officers.  In addition, upon information and belief, the

Company communicated directly with all Participants regarding the merits of investing in Coventry Stock in company-wide and uniform communications, and, yet, in the context of such communications failed to provide complete and accurate information regarding Coventry Stock as required by ERISA.

138.    In addition, Defendants were responsible for providing Participants in the Plan with investment education and communication.    Defendants, however, failed to disclose any information to the Plan Participants regarding Coventry's deceitful business practices and how these activities adversely affected Company stock as a prudent investment option under the Plan. Defendants thus breached their duty to provide Participants with complete and accurate information necessary for making informed investment decisions with regard to investment options under the Plan.

139.    Defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding Coventry Stock, making material misrepresentations about the Company's financial condition, and, generally, by conveying inaccurate information regarding the soundness of Coventry Stock and the prudence of investing retirement contributions in the Company's stock.

140.    These failures were particularly devastating to the Plan and the Participants, as a certain percentage of the Plan's assets were invested in Coventry Stock during the Class Period and, thus, the stock's precipitous decline had an enormous impact on the value of Participants' retirement assets.

141.    In addition, Coventry and the other defendants knew or should have known that information they possessed regarding the true condition of Coventry would have an extreme

impact on the Plan. Yet, in violation of their fiduciary duties, these Defendants failed to provide Participants with this crucial information.

142.    As a consequence of the failure of Defendants to satisfy their disclosure obligations under ERISA, Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in Coventry Stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by Participants, Coventry Stock was an inherently unsuitable and inappropriate investment option for their plan accounts. Had accurate information been provided, Participants could have protected themselves against losses accordingly, and consequently, Participants relied to their detriment on the incomplete and inaccurate information provided by Defendants in their fiduciary communications and failures thereof.

143.    As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses. If Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

144.    Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

145.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

146.    At all relevant times, as alleged above, Coventry and defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  At all relevant times, as alleged above, the scope of the fiduciary responsibilities of Coventry and defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries.  The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.

147.    The monitoring fiduciaries, Coventry and defendants had the duty to:

(a)    Ensure that the appointed the Plan fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, as noted above, and the behavior of the Plan's Participants;

(b)    Ensure that the appointed Plan fiduciaries are provided with adequate financial resources to do their job;

(c)    Ensure that the appointed Plan fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d)    Ensure that the appointed Plan fiduciaries have ready access to outside, impartial advisors when needed;

(e)    Ensure that the appointed Plan fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(f)    Ensure that the appointed Plan fiduciaries report regularly to the Company, the Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

148.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

149.    Coventry and defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the appointed Plan fiduciaries were given adequate information about the Company's business problems alleged above, which made Company Stock an imprudent investment, which was necessary for them to perform their duties of overseeing the Plan's investments, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund which was made up primarily of Company Stock, an investment that was imprudent and inherently subject to significant downward movements, especially here where the stock was artificially inflated by non-public corporate malfeasance and illicit activities.

150.    Coventry and defendants also breached this duty by not properly disclosing information, that they knew or should have known, about the Company's improper business practices to the Trustee.  The Trustee is responsible for investing and managing assets of the Plan.  However, in doing so, the Trustee shall be subject to the direction and guidance of Coventry.

151.    Coventry and the other defendants knew or should have known that the fiduciaries they were responsible for monitoring were (a) imprudently allowing the Plan to continue offering Coventry Stock as an investment alternative for the Plan, and (b) continuing to invest the assets of the Plan in Coventry Stock when it no longer was prudent to do so.  Despite this knowledge, Coventry and defendants failed to take action to protect the Plan, and concomitantly the Plan's Participants, from the consequences of these fiduciaries' failures.

152.    Coventry and defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the appointed Plan fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

153.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.

154.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C., § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

155.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

156.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

157.    ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the

interest of the Participants and beneficiaries and for the exclusive purpose of providing benefits to Participants and beneficiaries.

158.    Given the allegations listed above, Defendants clearly placed the interests of themselves and the Company, as evidenced by the longstanding artificial inflation of Company Stock, before the interests of the Plan and its Participants and beneficiaries.  These conflicts of interest put Defendants in the inherently problematic position of having to choose between their own interests as directors, officers, executives (and Coventry stockholders), and the interests of the Plan's Participants and beneficiaries, in whose interests Defendants were obligated to loyally serve with an "eye single."

159.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in Coventry Stock; failing to notify appropriate federal agencies, including the SEC of the facts and transactions which made Coventry Stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and themselves above the interests of the Participants with respect to the Plan's investment in Company Stock.

160.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

161.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

162.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

163.    As alleged herein, Coventry, through its officers and employees withheld material information from the Plan's Participants and provided inaccurate disclosures, by the conduct set forth above, and profited from such practices, and, thus, knowledge of such practices is imputed to these defendants as a matter of law.  In addition, as alleged herein on information and belief, Coventry and the other defendants participated in and/or knew about the Company's misrepresentations regarding the Company's financial condition.  Thus, these defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of Coventry Stock as an investment for the Participants' retirement assets.

164.    Despite this knowledge, Defendants knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's investment and holding of Coventry Stock during the Class Period.  They did so by themselves making imprudent and disloyal decisions respecting the Plan's investment in Coventry Stock in the manner alleged herein in violation of ERISA § 405(a)(1)(A).  In addition, these same defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plan's investment in Coventry Stock despite knowing such failures were

breaches of fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

165.    In further violation of ERISA § 405(a)(l)(C), Defendants also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole. Instead, they compounded the problem by downplaying the significance of Coventry's problems and further concealing such practices from Participants and the market as a whole.

166.    In addition, Defendants enabled the imprudent asset management decisions of any and all other defendant -- including any appointed plan fiduciaries -- who lacked knowledge of the circumstances rendering the stock imprudent, by failing to provide such persons with complete and accurate information regarding the stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by the Company's improper practices, so that these other defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in Coventry Stock. In so doing, Defendants breached ERISA § 405(a)(l)(B).

167.    Further, through their failure to properly and effectively monitor and remove those fiduciaries whose performance was inadequate as alleged above, Defendants enabled these appointed plan fiduciaries' imprudent management of the Coventry Stock in the Plan.

168.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

169.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT VI

170.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

171.    To the extent that Coventry is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Coventry knowingly participated in the breaches of those defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

172.    Coventry benefited from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by contributing Coventry Stock to the Plan while the value of the stock was inflated as the result of the breaches of fiduciary duty alleged herein and as a result of Coventry providing the market with materially inaccurate statements and omissions.  Accordingly, Coventry may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of Coventry Stock which would have been contributed to the Plan, but for Coventry's participation in the foregoing breaches of fiduciary duty.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for:

A.    A declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.      A declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(l)(B);

C.      An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

D.      Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Coventry Stock;

G.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts as benefits due in proportion to the accounts' diminution in value;

H.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

Dated:  October 13, 2009

John B. Isbister, Fed. Bar No. 00639
Toyja E. Kelley, Fed. Bar No. 26949
**TYDINGS & ROSENBERG LLP**
100 East Pratt Street
Baltimore MD 21202
Telephone: (410) 752-9700
Facsimile: (410) 727-5460
Email: jisbister@tydingslaw.com
Email: tkelley@tydingslaw.com

**GAINEY & MCKENNA**
Thomas J. McKenna
295 Madison Avenue, 4th Floor
New York, New York 10017
Telephone:  (212) 983-1300
Facsimile:  (212) 983-0380
Email: tjmlaw2001@yahoo.com
        tjmckenna@gaineyandmckenna.com

**Attorneys for Plaintiffs and the Class**

#1167591v.1                                    - 57 -