IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                          |   |                                |
|--------------------------|---|--------------------------------|
|                          | : |                                |
| LORETTA BOYD, ET AL.     |   |                                |
|                          | : |                                |
| v.                       | : | Civil Action No. DKC 09-2661   |
|                          | : |                                |
| COVENTRY HEALTH CARE INC.,|  |                                |
| ET AL.                   | : |                                |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this class action arising under the Employee Retirement Income Security Act ("ERISA") are unopposed motions filed by Plaintiffs (ECF Nos. 84 and 85) seeking an order that: (1) grants final approval of the Settlement Agreement (ECF No. 77) between Plaintiffs and Defendants Coventry Health Care, Inc., Dale B. Wolf, Daniel N. Mendelson, Rodman W. Moorhead, III, Timothy T. Weglicki, L. Dale Crandall, Elizabeth E. Tallett, Allen F. Wise, Joel Ackerman, Lawrence N. Kugelman, Shawn M. Guertin, Patricia Davis, John J. Ruhlmann, 401(K) Plan Investment Committee, Harvey DeMovick, James McGarry, Allen Spath, David Finkel, Maria Fitzpatrick, Richard Bates, John J. Ruhlmann, and John Does 1-20; (2) grants final certification of the Settlement Classes pursuant to Federal Rule of Civil Procedure 23; (3) approves the Plan of Allocation (ECF No. 77-4); (4) approves a payment of one-third of the Settlement Fund to class counsel for attorneys' fees; (5)

approves a payment of $137,315.65 to class counsel for litigation expenses; and (6) approves incentive payments to Loretta Boyd, Christopher Sawney, Karen Billig, Jack J. Nelson, and Karen Milner ("Named Plaintiffs") in the amount of $5,000 each; and (7) dismisses this action with prejudice, with the court to retain jurisdiction over the interpretation, enforcement, and implementation of the settlement agreement and the final order. For the following reasons, the motions will be granted, although the attorneys' fees will be reduced.

## I. Background

The Named Plaintiffs are former employees of Coventry Healthcare, Inc. ("Coventry") and participants in Coventry's Retirement Savings Plan (the "Plan"). On October 13, 2009, Plaintiff Boyd filed this ERISA lawsuit against Defendants as a putative class action. (ECF No. 1). Numerous related actions claiming identical violations of ERISA followed. On December 9, 2009, Judge Alexander Williams consolidated the cases and designated Harwood Feffer LLP and Gainey McKenna & Egleston to act as Interim Co-Lead Counsel and Tydings & Rosenberg LLP as Interim Liaison Counsel for the Plaintiffs. (ECF No. 13).[1]

---

[1] The cases consolidated with Boyd's were: *Billig v. Coventry Health Care, Inc., et al.*, 10-cv-00462-AW; *Nigro v. Coventry Health Care, Inc., et al.*, 09-cv-03074-AW; *Nelson v. Coventry Health Care, Inc., et al.*, 09-cv-03063-AW; and *Milner v. Coventry Health Care, Inc., et al.*, 09-cv-02850-AW. Mr.

Plaintiffs filed an amended complaint on June 28, 2010. (ECF No. 17). The alleged ERISA violations center on the Plan's investment in the stock of Coventry Healthcare, Inc., a national managed health care company located in Bethesda, Maryland. At issue is Coventry's Medicare Advantage Private-Fee-For-Service ("PFFS"). Coventry presented to investors – including the Plan participants – that Coventry's PFFS was performing very well. In fact, Coventry was having great difficulty timely and accurately processing PFFS claims, causing it materially to understate its true claims exposure, which in turn overstated the PFFS's profitability, distorting Coventry's financial performance. Coventry's actual performance started to reveal itself in summer 2008, sending the company's stock price from $40.00 per share to $13.93 per share. (ECF No. 17 ¶¶ 160 and 169). All the while, Defendants – each of whom are allegedly fiduciaries of the Plan within the meaning of ERISA – continued to have the Plan invest in Coventry stock, despite their alleged knowledge of Coventry's misrepresented financial health. The eventual decline in Coventry's stock price resulted in the Plan declining in value, which ultimately led to diminished account balances of the Plan's participants. The complaint brings a putative class action on behalf of all participants of the Plan

Nigro voluntarily withdrew as a plaintiff and class representative on March 8, 2011. (ECF No. 27).

who held Coventry stock from February 9, 2007 to October 28, 2008, alleging four counts, all violations of ERISA, 29 U.S.C. § 1001, *et seq.*: (1) failure prudently and loyally to manage the Plan and assets of the Plan; (2) failure to monitor fiduciaries; (3) failure to avoid conflicts of interest; and (4) co-fiduciary liability. (ECF No. 17 ¶¶ 202-257). The Named Plaintiffs sought a declaration that each Defendant breached its ERISA fiduciary duties to the Plan participants; an order compelling Defendants to make good to the Plan all losses resulting from Defendants' breaches and profits that would have accrued if Defendants fulfilled their fiduciary obligations; imposition of a constructive trust; an order enjoining each Defendant from any further violations of their fiduciary obligations under ERISA; an order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Coventry Stock; and actual damages, costs, attorneys' fees, and all appropriate equitable monetary relief. (ECF No. 17, at 92-93).

On August 12, 2010, Defendants moved to dismiss (ECF No. 20). In a memorandum opinion and order dated March 31, 2011, Judge Williams denied Defendants' motion as to counts one, two, and four, and granted the motion as to count three. (ECF Nos. 29 and 30). Defendants filed a motion to reconsider on April 14, 2011 (ECF No. 33), and answered the amended complaint on

June 6, 2011 (ECF No. 37). Judge Williams granted Defendants'
motion for reconsideration in part, dismissing count one as to
some of the Defendants. (ECF Nos. 46 and 47). Discovery
commenced and included a motion to compel that was resolved by
Magistrate Judge Jillyn K. Schulze. (*See* ECF Nos. 66 and 67).
The parties engaged in an all-day private mediation session in
May 2012 which proved unsuccessful. Parties engaged in another
mediation conference with Magistrate Judge William Connelly,
which led to the proposed settlement presently pending. (ECF
No. 84-1, at 16-17).

The parties filed a stipulation of settlement on September
23, 2013. (ECF No. 77). The class is non-opt-out and consists
of all persons who were participants in, or beneficiaries of,
the Plan and who held Coventry stock in their Plan accounts
between February 9, 2007 and October 22, 2008 ("Settlement
Class"). Coventry shall pay the class $3.6 million. After
attorneys' fees and administrative expenses are taken out, the
remainder will be distributed to class members *pro rata* based on
their losses relative to all other class members, but no monies
will be paid to class members whose final share is less than
$50.00. In exchange, the Settlement Class agrees to release
Defendants from any and all claims that relate directly or
indirectly to the facts that are, or could have been, alleged in
the amended complaint, including, but not limited to, any and

all claims under ERISA, with the exception of any claims at issue in *Plumbers Local No. 98 Defined Benefit Pension Fund v. Coventry Healthcare, Inc.*, No. 09-cv-2337-AW. (*See* ECF Nos. 77 and 77-4). During a hearing held on the settlement on October 23, 2013, Judge Williams preliminarily designated Harwood Feffer LLP and Gainey McKenna & Egleston as co-class counsel; preliminarily certified the class; and preliminarily approved the settlement subject to further consideration at the final fairness hearing. (ECF Nos. 81 and 82). The preliminary approval order approved the class notice and ordered the notice sent to each identified member of the settlement class via his or her email address and his or her last known mailing address by November 13, 201[3],[2] while also publishing the notice on the website specified.

On November 12, 2013, the class notice was sent via first-class mail to 20,356 members of the settlement class, and via email to 14,972 members. 338 notices came back undeliverable for which a search turned up no other viable addresses. (ECF No. 84-2, at 2-3).

On January 9, 2014, Plaintiffs filed unopposed motions for final approval of class certification, the settlement, the proposed plan of allocation, an award of attorneys' fees, reimbursement of expenses, and incentive awards. (ECF Nos. 84

---

[2] The handwritten date in the order mistakenly reads "2014."

and 85).  No class member has filed objections to the settlement nor did any objector appear at the January 30, 2014 final fairness hearing.

## II.  Analysis

The following issues remain: whether the Settlement Class should receive final certification; whether the Settlement Agreement and the Plan of Allocation are fair, reasonable, and adequate; and whether class counsel's request for attorneys' fees and litigation expenses, as well as payment of incentive payments to the Named Plaintiffs, should be granted.

### A.  Rule 23 Class Certification

A class action will be certified only if it meets the four prerequisites identified in Rule 23(a) and also fits within one of the three subdivisions of Rule 23(b).  The Supreme Court of the United States has held that district courts must pay "undiluted, even heightened attention" to class certification requirements in the settlement context.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (internal quotation marks omitted); *see also Grice v. PNC Mortg. Corp. of Am.*, No. CIV.A.PJM-97-3084, 1998 WL 350581, at *2 (D.Md. May 21, 1998) ("Despite the parties' agreement, class certification must be carefully scrutinized.").

## 1. Rule 23(a) Prerequisites

Rule 23(a) provides as follows:

> (a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Based on a review of the parties' submissions, the Rule 23 Settlement Classes meet the numerosity, commonality, typicality, and adequacy requirements.

### a. Numerosity

Although there is no precise threshold for determining numerosity, *see Gen. Tel. Co. v. E.E.O.C.*, 446 U.S. 318, 330 (1980), the Settlement Class, which consist of more than 20,000 individuals, is substantially larger than other classes that have been certified in the Fourth Circuit. *See, e.g., In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 78 (D.Md. 1997) (observing that a class size of 25 to 30 members raises a presumption that the numerosity requirement is met). Moreover, numerosity is satisfied where joinder of all putative class members would prove to be "impracticable." *Hewlett v. Premier Salons Int'l Inc.*, 185 F.R.D. 211, 215 (D.Md. 1997) (explaining that practicability of joinder depends on a variety of factors,

including the geographic dispersion of putative class members and the size of their claims).  When a class is large - as is the case here - the numbers alone may allow the court to presume impracticability of joinder.  *Id.; see also Stanley v. Central Garden and Pet Corp.*, 891 F.Supp.2d 757, 770 (D.Md. 2012) ("Classes of as few as 25 to 30 have been found to 'raise[] the presumption that joinder would be impracticable.'" (*quoting In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. at 78)).

### b. **Commonality**

To establish commonality, the party seeking certification must "demonstrate that the class members have suffered the same injury" and that their claims "depend upon a common contention." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) (internal quotation marks omitted).  "That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*  "A common question is one that can be resolved for each class member in a single hearing," and does not "turn[] on a consideration of the individual circumstances of each class member." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006).

Here, there are numerous questions of law and fact common to the Settlement Class, principally whether Defendants violated their fiduciary duties under ERISA by continuing to have the Plan invest in Coventry stock when they knew it was not a prudent investment. *See Tatum v. R.J. Reynolds Tobacco Co.*, 254 F.R.D. 59, 64 (M.D.N.C. 2008) (commonality satisfied where plaintiff allege defendants breached their fiduciary duties under ERISA by mismanaging the plan); *Banyai v. Mazur*, 205 F.R.D. 160, 163 (S.D.N.Y. 2002) ("In general, the question of defendants' liability for ERISA violations is common to all class members because a breach of a fiduciary duty affects all participants and beneficiaries."). Based on the foregoing, the Rule 23(a)(2) commonality requirement is satisfied.

### c. Typicality

The Supreme Court has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 158 n.13 (1982). To show typicality between a plaintiff and the class, the plaintiff "must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 156 (internal quotation marks omitted). The typicality requirement focuses on "whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective

nature to the challenged conduct." *Hewlett*, 185 F.R.D. at 217. As discussed in *Hewlett*, a plaintiff's claim may factually differ and still be "typical" of class member claims, if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Id.* (quotations omitted).

All of the Named Plaintiffs' claims are typical. They were all employed by Coventry and all held Coventry stock in their Plan accounts during the Class Period. The Named Plaintiffs' allegations that Defendants violated ERISA arise from a unified practice or course of conduct by Defendants, and like the other class members, Named Plaintiffs seek equitable relief for the alleged violations. Ultimately, "as goes the claim[s] of the [Named Plaintiffs,] so go the claims of" the Rule 23 Settlement Classes. *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006).

### d. Adequacy

Finally, Rule 23(a)(4) requires "representative parties [who] will fairly and adequately protect the interests of the class." Representation is adequate if: (1) the named plaintiff's interests are not opposed to those of other class members, and (2) the plaintiff's attorneys are qualified,

experienced, and capable. *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 558 (D.Md. 2006).

Here, the Named Plaintiffs' interests are aligned with those of the class members. Specifically, the Named Plaintiffs share an interest with class members in establishing Defendants' actions during the relevant period and showing that Defendants violated ERISA by failing to fulfill their fiduciary duties. Finally, the attorneys at Harwood Feffer, LLP and Gainey McKenna & Egleston are qualified, experienced, and competent, as evidenced by their background in litigating class-action cases involving ERISA violations. (*See* ECF Nos. 84-3, 84-4, and 84-5).

Accordingly, the Settlement Class satisfies each of the Rule 23(a) prerequisites.

### 2. Rule 23(b) Requirements

Plaintiffs invoke Rule 23(b)(1), which permits a class action to be maintained only if it can be concluded that:

> prosecuting separate actions by or against individual class members would create a risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>> (B) adjudications with respect to individual class members that, as a

> practical matter, would be dispositive
> of the interests of the other members
> not parties to the individual
> adjudications or would substantially
> impair or impede their ability to
> protect their interests.

Thus, subsection A seeks to avoid possible prejudice to the defendants, while subsection B attempts to eliminate prejudice to the putative class members. Several courts have held that the type of ERISA claims raised here are particularly appropriate for Rule 23(b)(1) certification. *See, e.g., In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 604 (3[d] Cir. 2009) ("In light of the derivative nature of ERISA § 502(a)(2) claims, breach of fiduciary duty claims brought under § 502(a)(2) are paradigmatic examples of claims appropriate for certification as a Rule 23(b)(1) class."); *DiFelice v. U.S. Airways*, 235 F.R.D. 70, 80 (E.D.Va 2006) ("Alleged breaches by a fiduciary to a large class of beneficiaries present an especially appropriate instance for treatment under Rule 23(b)(1). . . . [G]iven the derivative nature of suits brought pursuant to § 502(a)(2) on behalf of the Plan, ERISA litigation of this nature presents a paradigmatic example of a (b)(1) class." (internal quotation marks omitted)); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 453 (S.D.N.Y. 2004) (granting class certification under Rule 23(b)(1)(B) in a suit alleging breach of ERISA fiduciary duties). Where, as

here, "the allegations in the Complaint implicate misconduct in the management in the Plan as a whole, disparate lawsuits by individual participants would raise the specter of 'varying adjudications.'" *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 144 (S.D.N.Y. 2010) (internal quotation marks and alternation omitted). Plaintiffs' ERISA claims are similar to those at issue in the cases cited, thus certification of the proposed class in this suit under Rule 23(b)(1) is appropriate.

In sum, because the Settlement Class satisfies the requirements of both Rule 23(a) and 23(b)(3), final certification will be granted.

**B. Final Approval of the Settlement Agreement**

Pursuant to Rule 23(e), a settlement agreement that binds members of a class action can only be approved upon a "finding that it is fair, reasonable, and adequate." "The 'fairness' prong is concerned with the procedural propriety of the proposed settlement agreement, while the 'adequacy' prong focuses on the agreement's substantive propriety." *In re Am. Capital S'holder Derivative Litig.*, Civ. Nos. 11-2424 PJM, 11-2428 PJM/AW, 11-2459 PJM, 11-2459 RWT, 2013 WL 3322294, at *2 (D.Md. June 28, 2013).

**1. Fairness**

In evaluating the fairness of a proposed settlement, the following factors must be considered: "(1) the posture of the

case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel in the area of [ERISA] class action litigation." *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991). The fairness inquiry serves to protect against the danger that counsel might "compromis[e] a suit for an inadequate amount for the sake of insuring a fee." *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F.Supp. 1379, 1383 (D.Md. 1983) (internal quotation marks omitted).

Here, each fairness factor weighs in favor of final approval. The record indicates that the Settlement Agreement is a product of good faith, arms-length negotiations following two rounds of mediation, first privately and then with Magistrate Judge Connelly. In addition, the parties fully briefed a motion to dismiss and then a subsequent motion to reconsider. Plaintiffs "conducted an extensive investigation of [the] claims, including a review of the Plan's governing documents and materials, communications with Plan participants, internal [Coventry] documents regarding the Plan, SEC filings . . . and other publicly available documents." (ECF No. 84-1, at 29).

With respect to the posture of the case, the parties litigated the case since Plaintiffs filed the initial complaint on October 13, 2009, exchanged discovery demands, and received

documents and written responses thereto.   A discovery dispute
had to be adjudicated by Magistrate Judge Schulze.   It appears
that all parties had a clear view of the strengths and
weaknesses of their respective positions, and sufficient
information about the claims and defenses at the time they began
exploring the possibility of settlement.   Finally, as has been
noted, the declarations and resumes submitted by Plaintiffs'
attorneys establish that they are qualified, experienced, and
competent.

  **2.   Adequacy**

  The adequacy prong requires consideration of: "(1) the
relative strength of the plaintiff's case on the merits; (2) the
existence of any difficulties of proof or strong defenses the
plaintiffs are likely to encounter if the case goes to trial;
(3) the anticipated duration and expense of additional
litigation; (4) the solvency of the defendants and the
likelihood of recovery on a litigated judgment; and (5) the
degree of opposition to the settlement. *Jiffy Lube*, 927 F.2d at
159.   The purpose of the adequacy analysis is to "weigh the
likelihood of the plaintiff's recovery on the merits against the
amount offered in settlement." *Mid-Atl. Toyota*, 564 F.Supp. at
1384 (internal quotation marks omitted).

  Here, the adequacy factors, on balance, counsel in favor of
final approval of the Settlement Agreement.   The court partially

denied Defendant's motion to dismiss (ECF No. 25), but whether Plaintiffs would prevail on the merits if the case were to proceed is uncertain. Genuine disputes exist regarding whether each Defendant was a fiduciary of the Plan with respect to its investments in Coventry stock; whether each Defendant breached his or her fiduciary duties under ERISA with respect to the Plan's investments in Coventry; and whether that breach caused losses to the Plan, Plaintiffs, and the Settlement Class. Such demonstrations are "fraught with uncertainty," *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 308 (5th Cir. 2007), as ERISA claims for breach of fiduciary duty in connection with company stock are complex and quite new, with still evolving contours. *See Marsh*, 265 F.R.D. at 138-40.

Even if Plaintiffs were to overcome the liability obstacles, moreover, there are also risks in proving damages at trial. "[T]he damages issue is uncertain because courts have not had occasion to apply a damages measure in a case like this after a trial." *Id.* at 140. Furthermore, absent final approval of the Settlement Agreement, litigation of this dispute could prove to be long and expensive. In particular, the likely next steps in this case – *e.g.,* additional discovery and dispositive motions – would require substantial time by the parties' attorneys. Although there is nothing to indicate that Defendants would be unable to satisfy a judgment if one were

ultimately entered, it is not clear how long it might take to resolve this lawsuit. On balance, the risks, delays, and costs associated with further litigation weigh in favor of granting final approval of the Settlement Agreement.

Lastly, there has been no opposition to the Settlement Agreement. In November 2013, notice forms were mailed to over 20,000 Plan participants and emailed to nearly 15,000 participants. The notice forms informed each class member, in clear and concise language, of the basis for this lawsuit; the definition of the Settlement Class; the key terms of the Settlement Agreement; the process for objecting to the Settlement Agreement; and the date, time, and place of the final fairness hearing. Thus, the forms and method of notice complied with Fed.R.Civ.P. 23(c)(2) & 23(e). The postmark deadline for filing objections was January 20, 2014. (ECF No. 82, at 6). Neither the court nor counsel received any objections to the Settlement Agreement. The fact that no class member objected supports final approval of the Settlement as fair, adequate, and reasonable. Furthermore, the parties engaged an independent fiduciary to evaluate the proposed settlement, who found the settlement to be fair to the class members given the difficulties in proving Plaintiffs' case. In sum, the Settlement Agreement is a good result for the class members when considered in light of the disputed liability and difficulty in

proving a case of this type. Accordingly, the Settlement Agreement will be approved.

### C. **Plan of Allocation**

> Like the analysis above of the Settlement, the plan of allocation must also meet the standards of fairness, reasonableness, and adequacy. In evaluating a plan of allocation, the opinion of qualified counsel is entitled to significant respect. The proposed allocation need not meet standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis.

*In re The Mills Corp. Sec. Litig.,* 265 F.R.D. 246, 258 (E.D.Va. 2009) (citations omitted). Here, the Plan of Allocation provides a recovery to the Class, net of administrative costs, attorneys' fees and other expenses, on a *pro rata* basis according to each Class Member's recognized claim of damages. Each Class Member will receive a share of the net proceeds of the Settlement Fund, based approximately on the decline in the value of Coventry stock held in that Class Member's plan during the Class Period in comparison to the decline in value of Coventry Stock held by other Class Members in their Plan accounts, although no Class Member whose share is less than $50 will receive an award, owing to the costs of administering the benefits. (ECF No. 77-4). All Class members are treated equally under the formula and no objections to the Plan of Allocation have been raised. The Plan of Allocation is similar

to those approved by other courts in company stock fund ERISA cases. *See, e.g.*, *In re AOL Time Warner ERISA Litig.*, No. 02 Civ. 8853 SWK, 2006 WL 2789862, at *7-8 (S.D.N.Y. Sept. 27, 2006). Accordingly, the Plan of Allocation is fair and reasonable and will be approved.

### D. Attorneys' Fees, Litigation Expenses, Settlement Administration Expenses, and Incentive Awards

Finally, Plaintiffs seek attorneys' fees in the amount of one-third of the Settlement Amount, or $1,200,000; reimbursement of litigation expenses in the amount of $137,315.65; and incentive awards to each Named Plaintiff in the amount of $5,000. (ECF No. 85). For the following reasons, the court will grant the request for litigation expenses and incentive awards in full but reduce the attorneys' fees to $1 million.

#### 1. Attorneys' Fees

"It is for the district court in the first instance to calculate an appropriate award of attorney's fees." *Carroll v. Wolpoff & Abramson*, 53 F.3d 626, 628 (4th Cir. 1995). Rule 23 permits a court to award "reasonable attorney's fees . . . that are authorized by law or by the parties' agreement." Fed.R.Civ.P. 23(h). The court must determine the best method of calculating attorneys' fees to appropriately compensate class counsel. There are two primary methods of calculating attorneys' fees: (1) the "percentage of recovery" or "percentage

of the fund" method; and (2) the "lodestar" method. *Whitaker v.*
*Navy Fed. Credit Union*, No. RDB 09-cv-2288, 2010 WL 3928616, at
*4 (D.Md. Oct. 4, 2010). With either method, the goal is to
make sure that counsel is fairly compensated. The United States
Court of Appeals for the Fourth Circuit has not decided which of
the general approaches to adopt, although the "current trend
among the courts of appeal favors the use of a percentage method
to calculate an award of attorneys' fees in common fund cases."
*Goldenberg v. Marriott PLP Corp.*, 33 F.Supp.2d 434, 438 (D.Md.
1998); *see also Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890
F.Supp. 499, 503 (E.D.Va. 1995) ("the percentage method is more
efficient and less burdensome than the traditional lodestar
method, and offers a more reasonable measure of compensation for
common fund cases."). "[U]sing the percentage of fund method
and supplementing it with the lodestar cross-check . . . take[s]
advantage of the benefits of both methods." *The Mills Corp.*,
265 F.R.D. at 261.[3] Accordingly, in this case, the "percentage
of recovery" method cross-checked by the "lodestar" method is

---

[3] "Using the percentage method, cross-checked by the
lodestar method reduces the risk that the amount of the fee
award either overcompensates counsel in relation to the class
benefits obtained or undercompensates counsel for their work."
*In re Heartland Payment Systems, Inc. Customer Data Sec. Breach
Litig.*, 851 F.Supp.2d 1040, 1073 (S.D.Tex. 2012); *see also In re
Royal Ahold N.V. Securities & ERISA Litig.*, 461 F.Supp.2d 383,
385 (D.Md. 2006) ("both are useful tools for trial courts to use
to inform and calibrate a judgment as to a fair and reasonable
. . . fee award.").

the appropriate method for reviewing the proposed attorneys' fees under Rule 23(h).

### a. "Percentage of Recovery" or "Percentage of the Fund" Method

The Supreme Court has "recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Under the "percentage of recovery" or "percentage of the fund" method, the court awards attorneys' fees as a percentage of the common fund used to pay class members' damages and claims. *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984).[4] An attractive aspect of the "percentage of recovery" method is its results-driven nature which "ties the attorneys' award to the overall result achieved rather than the hours expended by the attorneys." *Jones v. Dominion Res. Servs.*, 601 F.Supp.2d 756, 759 (S.D.W.Va. 2009).

The Fourth Circuit has not yet identified factors for district courts to apply when using the "percentage of recovery" method. District courts in this circuit have analyzed the following seven factors: (1) the results obtained for the class;

---

[4] "The [common-fund] doctrine provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 187 (3[d] Cir. 2005).

(2) the quality, skill, and efficiency of the attorneys involved; (3) the risk of nonpayment; (4) objections by members of the class to the settlement terms and/or fees requested by counsel; (5) awards in similar cases; (6) the complexity and duration of the case; and (7) public policy;. *Domonoske v. Bank of Am., N.A.*, 790 F.Supp.2d 466, 475 (W.D.Va. 2011); *The Kay Company v. Equitable Prod. Co.*, 749 F.Supp.2d 455, 464 (S.D.W.Va. 2010); *The Mills Corp.*, 265 F.R.D. at 261; *Jones*, 601 F.Supp.2d at 760. Importantly, "fee award reasonableness factors 'need not be applied in a formulaic way' because each case is different, 'and in certain cases, one factor may outweigh the rest.'" *In re AT&T Corp.*, 455 F.3d 160, 166 (3[d] Cir. 2006) (*quoting In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 (3[d] Cir. 2005)).

### i. Results Obtained for the Class

As mentioned above, a major advantage of the "percentage of recovery" method is that it considers the results that class counsel actually obtained for the class as opposed to the number of hours they expended. *See Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *Brodziak v. Runyon*, 145 F.3d 194, 196 (4th Cir. 1998) ("the most critical factor in calculating a reasonable fee award is the degree of success obtained." (internal quotations omitted)); Fed.R.Civ.P. 23(h) advisory committee notes to 2003 amendments (explaining that the "fundamental focus" in

determining a common fund attorneys' fee award "is the result actually achieved for class members").

As class counsel highlight in the memorandum supporting the request for attorneys' fees, the Settlement Class obtained considerable value and benefit from the settlement. Defendants have consented to a common fund of $3.6 million to be distributed to a class of over 20,000. While this is not a "megafund" case, class counsel nevertheless achieved a substantial value on behalf of the class, given the complexity and uncertainty of litigation of this type. Unfortunately, owing to the complexity of the Plan of Allocation, Plaintiffs were not able to provide estimates as to: (1) how many class members will get nothing because their *pro rata* share falls below the $50 *de minimis* amount, or (2) the range of awards that will be deposited in Plan members' accounts. Defendants' counsel represented that he was almost certain that some will recover thousands of dollars. While the unknowns as to individual recoveries make it difficult to assess degree of success in one respect, the recovery for the class in the aggregate crosses the threshold of success. In the aggregate, the settlement obtained $3.6 million for a class of over 20,000. Counsel estimated the actual Plan losses to be between $7.5 million and $111 million, depending on which measure of damages

would have been adopted.[5] While Class Counsel engage in some overstatement when they state that "thousands of people will recover substantial sums due to the efforts of Class Counsel," undoubtedly a claim for an ERISA violation based on imprudent investments presents a challenge for which a considerable recovery is commendable. *See, e.g., In re Wachovia Corp. ERISA Litig.*, Civ. No. 3:09cv262, 2011 WL 7787962, at *4 (W.D.N.C. Oct. 24, 2011) (finding a $12.35 million settlement for approximately 150,000 class members in an ERISA class action a "significant" and "fair result for the class"); *Moore v. Comcast Corp.*, Civ. Action No. 08-773, 2011 WL 238821, at *4 (E.D.Pa. Jan. 24, 2011) (finding a settlement of $5 million for a class of approximately 35,000 to be "reasonable considering the defendants denied, and continue to deny, liability and litigated this case before the court for two years before they settled."); *Mehling v. N.Y. Life Ins. Co.*, 248 F.R.D. 455, 465 (E.D.Pa. 2008) (finding that a $14 million settlement for a class of approximately 45,600 "represents a successful result"); *In re Sprint Corp. ERISA Litig.*, 443 F.Supp.2d 1249, 1270-71 (D.Kan. 2006) (a settlement of $25 million for a class of more than

---

[5] There are roughly three measurements of losses: (1) losses incurred only by new money entering the Plan in Coventry stock during the Class Period; (2) losses in the value of all Coventry stock held by the Class during the Class Period; and (3) the value between the scenario number two and the amount that would have been realized had the resources invested in Coventry stock been put in more prudent investments.

67,000 is "extraordinary compared to the anticipated difficulties of establishing significant amounts of damages even if plaintiffs could have overcome the numerous obstacles for establishing liability."). The Settlement Agreement was reviewed by an independent fiduciary, who endorsed the settlement, finding it fair given the difficulties Plaintiffs would have faced had litigation gone forward. This fact, combined with the fact that no objections have been filed, further suggests that the result achieved is a desirable one.

### ii. Quality, Skill, and Efficiency of the Attorneys Involved

As noted above, Plaintiffs' attorneys are experienced and skilled ERISA class action litigators who achieved a favorable result for the Settlement Class. Counsel exchanged discovery with Defendant and litigated a dispute in front of Magistrate Judge Schulze; participated in two rounds of all-day mediation; and fully briefed a motion to dismiss and the subsequent motion to reconsider. Plaintiffs' attorneys also "reached a favorable settlement after evaluating the strengths and weaknesses of the respective positions and negotiating with sophisticated defense attorneys," from Morgan, Lewis & Bockius LLP, a global law firm. *The Mills Corp*, 265 F.R.D. at 262 (quality of opposing counsel is a factor to be considered in evaluating class counsel performance).

### iii. Risk of Nonpayment

"In determining the reasonableness of an attorneys' fee award, courts consider the relative risk involved in litigating the specific matter compared to the general risks incurred by attorneys taking on class actions on a contingency basis." *Jones*, 601 F.Supp.2d at 762. The risk undertaken by class counsel is evaluated by, among other things, the presence of government action preceding the suit, the ease of proving claims and damages, and, if the case resulted in settlement, the relative speed at which the case was settled. *Id.; see also Strang*, 890 F.Supp. at 503 (finding that risks to plaintiffs' counsel were minimized by settlement within six-months from the filing of the complaint and consequently reducing the percentage award from 30% to 25% of the Settlement Fund).

Despite the attorneys' skill and experience in litigating ERISA class actions, there existed meaningful risk of non-recovery here, although this is a reality in the vast majority of litigation. Class counsel contend that the case may not have been profitable at all, given that counsel took it on a contingency basis and the difficulties of proving liability in an ERISA case of this nature. (ECF No. 85-1, at 25). Counsel further argue that the risk of nonpayment was amplified by the developing nature of this area of law.

While every attorney undertaking a class action bears substantial risks, those risks are especially pronounced in ERISA litigation of this nature. *See In re Schering-Plough Corp. Enhance ERISA Litig.*, Civ. Action No. 08-1432 (DMC)(JAD), 2012 WL 1964451, at *5 (D.N.J. May 31, 2012) (ERISA class actions based on imprudent investments in company stock "involve a complex and rapidly evolving area of law"); *AOL Time Warner*, 2006 WL 2789862, at *7-8 (outlining the "considerable risk" faced by plaintiffs bringing an ERISA class action alleging breach of fiduciary duty). Unlike other class actions where the risks of nonpayment largely dissipate once settlement negotiations begin, *Jones*, 601 F.Supp.2d at 763, nothing is guaranteed in this sort of litigation especially where, as here, a prior mediation session was unsuccessful and the case had been in intense litigation for nearly four years. Accordingly, it appears that class counsel experienced higher risk in the pursuit of this case than that present in other class actions.

### iv. Objections

As noted above, class members were notified directly of the proposed settlement terms in the Settlement Agreement, including an explanation of the attorneys' fee request. (*See* ECF No. 77-2, at 8). No one filed objections to either the settlement terms or the proposed attorneys' fees. Furthermore, no class member objected at the final fairness hearing on January 30,

2014.  The lack of objections tends to show that at least from the class members' perspective, the requested fee is reasonable for the services provided and the benefits achieved by class counsel.  Nevertheless, the court must still determine the reasonableness of the requested fee applying the remaining factors.

### v. Awards in Similar Cases

Attorneys' fees awarded under the "percentage of recovery" method are generally between twenty-five (25) percent and thirty (30) percent of the fund.  Manual for Complex Litigation ("MCL"), § 14.121.  While the Fourth Circuit has not yet addressed this issue, several courts have established benchmarks, subject to upward or downward adjustment depending on the facts of the class actions.  "The Ninth and Eleventh Circuit generally use a 25% benchmark for common-fund cases." *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F.Supp.2d 1040, 1080 (S.D.Tex. 2012).  The Second and Third Circuits, on the other hand, have not relied on rigid benchmarks, and instead consider the specific circumstances of each case based on factors enunciated in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).  *See, e.g., Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 51-52 (2[d] Cir. 2000); Third Circuit 2001 Task Force Report on Selection of Class Counsel, 74 Temp.L.Rev. 689, 705 (2001) (recommending that

courts "avoid rigid adherence to a 'benchmark'" and concluding that "a percentage fee, tailored to the realities of the particular case, remains superior to any other means of determining a reasonable fee for class counsel."). "In fact, cases generating comparatively smaller funds can require a higher percentage fee award, due to the perception that large percentages of very large settlements lead to windfalls for attorneys." *Serrano v. Sterling Testing Sys., Inc.*, 711 F.Supp.2d 402, 420 (E.D.Pa. 2010); *see also In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 339 (3[d] Cir. 1998) (noting inverse relationship of large settlement to smaller percentage award).

In considering awards in similar cases, courts look to cases of similar size, rather than similar subject matter. *See In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 737 (3[d] Cir. 2001); *The Mills Corp.*, 265 F.R.D. at 263-64 ("comparing the size of the fund and percentage of the award in other cases to the present case . . . provides a valuable point of reference."). Fees awarded under "the percentage-of-recovery" method in settlements under $100 million have ranged from 15% to 40%. *See Stoner v. CBA Information Services,* 352 F.Supp.2d 549, 553 (E.D.Pa. 2005). Cases in this circuit involving settlement comparable to the $3.6 million settlement fund here have resulted in awards of attorneys' fees in the ranges of 25% to

28% of the common fund. *See In re SPX Corp. ERISA Litig.* (W.D.N.C. 2007) (28% of the fund awarded, where the fund was $3.6 million); *Smith v. Krispy Kreme Doughnut Corp.*, 2007 WL 119157, at *3 (M.D.N.C. 2007) (26% of the fund awarded where the fund was $4,750,000); *Mason v. Abbot Labs.* (N.D.W.Va. 2001) (25% of the fund awarded where the fund was $1,705,200); *Braun v. Culp, Inc.* (M.D.N.C. 1985) (25% of the fund awarded where the fund was $1.5 million). Furthermore, a recent study in the *Journal of Empirical Studies* found that for class recoveries in the range of $2.8 to $5.3 million, the mean attorneys' fee percentage award from 1993-2008 was approximately 26.4%, and the median was 25.0%. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008,* 7 J.Emp.L.Studies 248, 265 T.7 (June 2010). In terms of attorneys' fee awards in comparable ERISA cases, awards range from 19% to 45%, *Schering-Plough*, 2012 WL 1964451, at *7, but typically fall between 30% and 33% of the Settlement fund. *Griffin v. Flagstar Bancorp, Inc.*, No. 2:10-cv-10610, 2013 WL 6511860, at *8 (E.D.Mich. Dec. 12, 2013). Striking the balance between the percentage awarded in cases in this circuit for an award of this magnitude and those given in cases of this type across the nation, $1 million - approximately twenty-eight (28) percent - would appear to be an appropriate number.

### vi. The Complexity and Duration of the Litigation

The 'complexity and duration' element suggests that recovery in the amount of $1 million is more appropriate here. "In evaluating the complexity and duration of the litigation, courts consider not only the time between filing the complaint and reaching settlement, but also the amount of motions practice prior to settlement, and the amount and nature of discovery." *Jones*, 601 F.Supp.2d at 761; *see also In re Cendant*, 243 F.3d at 736-36. Cases are considered more complex where the applicable laws are new, changing, or unclear. *See Goldenberg*, 33 F.Supp.2d at 439 (finding that the case was "fairly complex, requiring analysis of several complicated financing arrangements and tax shelter opportunities in the context of a business and regulatory climate in flux."). In a settlement context, courts consider whether negotiations were "hard fought," "complex," or "arduous." *In re Merrill Lynch*, 249 F.R.D. at 138.

The instant litigation was both protracted and complex. Plaintiffs brought an action against Defendants for breach of their fiduciary duties under ERISA for continuing to make investments in Coventry stock which they knew to be imprudent. Numerous courts have emphasized the many hurdles plaintiffs must clear to succeed on such a claim, including proving: (1) each Defendant is a fiduciary; (2) each Defendant breached a duty; (3) that the breach has caused damage; and (4) the amount of

damages that are attributable to the fiduciary breaches. *In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 374 (S.D.Ohio 2006). Moreover, unlike securities class actions which have seventy-five years of precedent, ERISA jurisprudence concerning the performance of company stock is thin, with the first cases filed in the late 1990s. *Marsh*, 265 F.R.D. at 147. Compounding the issue, ERISA law is still developing, as the law was "designed primarily to regulate traditional defined benefit plans, as opposed to 401(k) plans, which did not even exist when ERISA was enacted." *Id*.

On the other hand, discovery in this case was relatively straightforward. Class counsel highlight that the parties exchanged initial disclosures and engaged in a motion to compel (ECF No. 85-1, at 23-24), but there is no evidence that discovery was particularly challenging or that class counsel had to fight for access to documents. *See Jones*, 601 F.Supp.2d at 762 (finding that discovery was straightforward where class counsel reviewed over 118,000 pages of documents); *see also Domonoske*, 790 F.Supp.2d at 476 (noting that discovery was brief where class counsel obtained fewer than 10,000 pages of written discovery). This case also involved limited motions practice, with only a motion to dismiss followed by a motion to reconsider over four years. *See Jones,* 601 F.Supp.2d at 762 (finding motions practice to be minimal where the parties only briefed

two motions over the course of one year). On balance, the foregoing considerations weigh in favor of reducing the attorneys' fees award to $1 million or approximately twenty-eight (28) percent.

### vi. Public Policy

"The most frequent complaint surrounding class action fees is that they are artificially high, with the result (among others) that plaintiffs' lawyers receive too much of the funds set aside to compensate victims." Report on Contingent Fees in Class Action Litigation, 25 Rev.Litig. 459, 466 (2006). "Such perceptions are not only harmful to the legal profession, but undermine the integrity of the entire legal system." *Jones*, 601 F.Supp.2d at 764. Thus, in assessing the reasonableness of the requested attorneys' fees, the court must strike the appropriate balance between promoting the important public policy that attorneys continue litigating class action cases that "vindicate rights that might otherwise go unprotected," and perpetuating the public perception that "class action plaintiffs' lawyers are overcompensated for the work that they do." Third Circuit Task Force Report, 208 F.R.D. 340, 342, 344 (Jan. 15, 2002). Courts in this circuit have recognized that "[t]his concern is not a trivial one and requires attentiveness . . . in awarding fees." *The Mills Corp.*, 265 F.R.D. at 263; *see also Domonoske*, 790 F.Supp.2d at 476 ("the court notes the need to 'properly

balance[ ] the policy goals of encouraging counsel to pursue meritorious [litigation in the relevant legal field, consumer litigation here,] . . . while [also] protecting against excessive fees.'" (*quoting In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2$^d$ Cir. 2008)) (alterations in original); *The Kay Company*, 749 F.Supp.2d at 469 ("[b]ecause of the damage caused by the perception of overcompensation of attorneys in class action suits, lawyers requesting attorneys' fees and judges reviewing those requests must exercise heightened vigilance to ensure the fees are in fact reasonable beyond reproach and worthy of our justice system.").

Here, a reduction of the attorneys' fees award to $1 million dollars or approximately 28% of the common fund would be more reasonable in light of these competing public policy concerns. Although no class member objected to the proposed attorneys' fee of up to one-third of the common fund, they had and have no notice concerning the range of individual recoveries except that some will receive no benefit if their "loss" is below $50.00. Of course, deduction of the requested fees reduces the class members' potential recovery by a significant percentage. Plaintiffs argue that the cost and difficulty of bringing an action act as a deterrent. Consequently, it furthers public policy to award sufficient attorney's fees to incentivize lawyers to enforce federal laws. (ECF No. 85-1, at

29-30).  Based on the foregoing, however, a nominal reduction in the requested fee award is sufficient to account for the risks class counsel identifies while continuing to promote the policy goals of enforcing consumer goals and protecting against excessive fees.  *See The Kay Company*, 749 F.Supp.2d at 468-69 ("It is not at all clear . . . that the increased risk to class counsel of investing time and resources to prosecute class actions justifies the treatment of such cases as entirely analogous to individual claims for fee award purposes. Increasing the number of class action plaintiffs does not necessarily increase the amount of time class counsel spends on a case.").

**b.   Lodestar Cross-Check**

Under the "lodestar" method, a district court identifies a lodestar figure by multiplying the number of hours expended by class counsel by a reasonable hourly rate.  *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008).  The court may then adjust the lodestar figure using a "multiplier" derived from a number of factors, including the benefit obtained for the settlement class, the complexity of the case, and the quality of the representation.  *See The Kay Company,* 749 F.Supp.2d at 462; *see also In re Microstrategy, Inc. Sec. Litig.*, 172 F.Supp.2d 778, 786-87 (E.D.Va. 2001).

The purpose of a lodestar cross-check is to determine whether a proposed fee award is excessive relative to the hours reportedly worked by counsel, or whether the fee is within some reasonable multiplier of the lodestar. *Rite Aid Corp.*, 396 F.3d at 306 ("The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method"); *Viscaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("[T]he lodestar may provide a useful perspective on the reasonableness of a given percentage award."). Importantly, "where the lodestar fee is used 'as a mere cross-check' to the percentage method of determining reasonable attorneys' fees, 'the hours documented by counsel need not be exhaustively scrutinized by the district court.'" *Royal Ahold*, 461 F.Supp.2d at 385 (*quoting Goldberger*, 209 F.3d at 50).

A lodestar cross-check confirms that attorneys' fees of $1 million of the $3.6 million settlement fund is a reasonable fee award for class counsel here. Class counsel claim a lodestar of approximately $1,579,878.25, which represents 2,987.75 hours billed by twenty-one (21) attorneys across five firms at rates ranging from $325 to $700 per hour and eight professional support staff, including law clerks, paralegals, legal assistants, litigation support staff, and class action clerks,

at rates ranging from \$175 to \$250 per hour. (ECF Nos 84-3, 84-4, 84-5, 84-6, 86-1 and 86-2).[6] Courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee. *See Goldenberg*, 33 F.Supp.2d at 439 n.6; *see also In re Microstrategy, Inc.*, 172 F.Supp.2d at 789 (reducing fee award from a requested percentage, which would have resulted in an award approximately four times the lodestar figure, to a percentage that resulted in an award 2.6 times the lodestar figure); *In re Cendant*, 243 F.3d at 742 ("[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.").

Here, class counsel's request for one-third of the settlement amount yields a lodestar multiplier of approximately 0.76. (ECF No. 85-1, at 27). The range of multipliers on ERISA company stock cases have ranged from 0.7 to 4.8. *See Marsh*, 265 F.R.D. at 149. While reducing the award to approximately twenty-eight percent results in a multiple of 0.63, and ERISA litigation of this type is complex, considering the history of

---

[6] These hourly rates, while quite high for this district, are within a reasonable range for firms with national class action practices. *See, e.g, In re Telik, Inc. Sec. Litig.*, 576 F.Supp.2d 570, 589 (S.D.N.Y. 2008) (finding reasonable hourly rates of \$700 to \$750 for partners). In any event, as noted above, the court need not engage in an intensive analysis of the rates charged when applying the lodestar analysis merely as a cross-check, in contrast to employing the lodestar method in full. *See In re WorldCom Sec. Litig.*, 388 F.Supp.2d 319, 355 (S.D.N.Y. 2005).

this litigation and the public policy concerns with large percentage awards in common fund cases, the lower award is more reasonable. Furthermore, the low multiplier is, of course, the result of the claim for nearly 3,000 hours at very high hourly rates. While it is not necessary to scrutinize Class Counsel's representations as closely as in pure lodestar cases, some assessment would be appropriate. This record, however, contains only the total hours spent by each attorney and other professional, with no specification of date or task. Without that back-up detail, it is impossible to assess duplication of effort or unproductive time. Accordingly, any assertion that the quoted multiplier is artificially low likely results from an inflated lodestar given the characteristics of this case.

## 2. Reimbursement for Litigation Expenses

In addition to attorneys' fees, Plaintiffs' attorneys seek $137,315.65 in out-of-pocket expenses incurred throughout the litigation. (ECF No. 85-1, at 22). "It is well-established that plaintiffs who are entitled to recover attorneys' fees are also entitled to recover reasonable litigation-related expenses as part of their overall award." *Kabore v. Anchor Staffing, Inc.*, No. L-10-3204, 2012 WL 5077636, at *10 (D.Md. Oct. 17, 2012). The Fourth Circuit has stated that such costs may include "those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in

the course of providing legal services." *Spell v. McDaniel*, 852 F.2d 762, 771 (4th Cir. 1988) (internal quotations omitted). Examples of costs that have been charged include necessary travel, depositions and transcripts, computer research, postage, court costs, and photocopying. *See Almendarez v. J.T.T. Enters. Corp.*, No. JKS 06-68, 2010 WL 3385362, at *7 (D.Md. Aug. 25, 2010) (*citing Vaughns v. Bd. of Educ. of Prince George's Cnty.*, 598 F.Supp. 1262, 1289-90 (D.Md. 1984)).

The court has reviewed the itemization submitted by class counsel of the incurred costs and expenses. The itemization included filing fees, expert and mediation fees, travel costs, computer research, copies, and other miscellaneous costs. (ECF Nos 84-3, 84-4, 84-5, 84-6, 86-1 and 86-2). The requested reimbursement for expenses appears to be reasonable and typical. Accordingly, the request for $137,315.65 in expenses will be approved.

### 3. Settlement Administration Expenses

The Settlement Agreement provides that the costs of settlement administration will be drawn from the $3.6 Settlement Fund. The Agreement provides no limit on the amount of those expenses, however. At the final fairness hearing, Plaintiffs submitted that they have received bids for the work and have chosen a company, one they have used in the past. They anticipate the costs of administrating the Settlement (fees and

expenses) to be between fifty and sixty thousand dollars
($50,000 - $60,000). Class counsel could only provide an
estimate, however, as they have not yet signed a contract
capping costs. The court relies on those cost estimations in
arriving at its conclusions regarding attorneys' fees and
litigation expenses, and Counsel are well-advised to meet that
budget.

**4. Reasonableness of the Incentive Payments**

As a last step in granting final approval of the Settlement
Agreement, the court must assess the reasonableness of the
$5,000 incentive payments to each Named Plaintiff: Loretta Boyd,
Christopher Sawney, Karen Billig, Jack J. Nelson, and Karen
Milner.

Incentive payments to class representatives have been
awarded in Rule 23 class actions. *See, e.g., In re Tyson Foods,
Inc.*, No. RDB-08-1982, 2010 WL 1924012, at *4 (D.Md. May 11,
2010). "Because a named plaintiff is an essential ingredient of
any class action, an incentive award is appropriate if it is
necessary to induce an individual to participate in the suit."
*Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). To
determine whether an incentive payment is warranted, a court
should consider "the actions the plaintiff has taken to protect
the interests of the class, the degree to which the class has
benefitted from those actions, and the amount of time and effort

the plaintiff expended in pursuing the litigation." *Id.* at
1016.

Here, the Settlement Agreement – to which no one has
objected - contemplates an incentive payment of $5,000 to each
Named Plaintiff, in addition to their receipt of a settlement
payment. (ECF No. 77, at 17). In the final approval motion,
Plaintiffs represent that this award is justified because each
Named Plaintiff spent a considerable amount of time over the
past four years contributing to the litigation and benefiting
the class by reviewing the relevant documents; staying apprised
of developments in the case and making themselves available to
class counsel; providing class counsel extensive information and
materials regarding their Plan investments; responding to
Defendants' document requests; and reviewing and ultimately
approving the terms of the settlement.

In light of the Named Plaintiffs' role in initiating this
lawsuit and devoting the time and effort necessary to achieve a
favorable resolution, the relatively modest incentive payment of
$5,000 to each Named Plaintiff is reasonable and will be
approved. This amount is comparable to incentive payments
approved in similar ERISA cases. *See, e.g.*, *Griffin*, 2013 WL
6511860, at *9 (approving incentive payment of $5,000);
*Wachovia*, 2011 WL 7787962, at *7 (same); *Broadwing, Inc.*, 252
F.R.D. at 382 (same); *Sprint Corp.*, 443 F.Supp.2d at 1271

42

(same); *In re WorldCom, Inc. ERISA Litig.*, Case No. 02 Civ. 4816(DLC), 2004 WL 2338151, at *11 (S.D.N.Y. Oct. 18, 2004) (same).

## III. Conclusion

For the foregoing reasons, the unopposed motion for final approval of the Settlement Agreement will be granted, with the change in the amount for attorneys' fees. A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
